Charles W. STALLINGS, Phillip R. Robertson and Alfonso C. Tolbert, Plaintiffs,

v.

CONTAINER CORPORATION OF AMERICA, Defendant.

Civ. A. No. 4646.

United States District Court, D. Delaware.

July 15, 1977.

John S. Grady and Thomas S. Neuberger, of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiffs.

William J. Wier, Jr. and Gerard P. Kavanaugh, Jr., of Murdoch & Walsh, Wilmington, Del., Robert H. Cannon, Container Corp. of America, Chicago, Ill., for defendant.

STAPLETON, District Judge:

The plaintiffs in this case are three blacks who are long-time wage roll employees of defendant Container Corporation of America's ("Container's") Wilmington, Delaware facilities. They charge that they have been passed over for promotion to the level of shift foreman as a result of employment practices of Container which discriminate against people of their race. Two of the plaintiffs, Robertson and Stallings, filed a charge against Container with the EEOC on March 29, 1970, and they ground their suit on Title VII. Plaintiff Tolbert, on the other hand, filed no relevant charge with the EEOC and makes his claim under 42 U.S.C. § 1981. A non-jury trial was held and the following represent the Court's findings of fact and conclusions of law with respect to the merits of the case.

## BACKGROUND

Container's Wilmington facilities are divided into three parts: (1) the Wilmington Plastics Plant, (2) the Heisler Compounding Division, and (3) the divisional offices of the

Plastics Division. The plaintiffs' complaint pertains only to the Plastics Plant and the Heisler Compounding Division.

The Plastics Plant makes plastic into finished articles. Specifically, it manufactures plastic containers from five gallons up to twenty-four hundred gallons. Its functions are divided into six departments: Blow Molding, Tank, Gyro, Material Handling, Maintenance and Quality Control.

Blow Molding is the largest department in the plant (geographically and by population). Blow Molding has its own assembly and material handling and shipping function in addition to the manufacturing or production operations. These functions are analogous to those performed by the Material Handling Department which services the entire plant. A shift foreman in Blow Molding supervises between 12 and 23 hourly employees.

The Tank Department manufactures large plastic containers (55 gals. to 2,500 gals.). It is a small department which has two machines, but the department supervisor acts almost as his own plant manager, handling production, design, and shipping on his own.

The Gyro Department produces polyethylene liners for industrial drums. It is larger than the Tank Department, having six machines. The largest number of people a shift supervisor would supervise in Gyro would be eight or nine.

The Material Handling Department is responsible for the assembling of the Gyro liners and steel drums and for arranging the shipping of those finished products to customers. In this area a shift supervisor would supervise between 12 and 18 individuals.

The Maintenance Department is responsible for all machinery and plant maintenance in the Plastic Plant and the Compounding Division. The work is technical and sophisticated because of the nature· of the machinery which must be maintained and repaired.

The Quality Control Department is responsible for inspecting and testing the finished products to ensure that they meet company standards. It has approximately 18 employees.

The Heisler Compounding Division provides the Plastics Plant with the necessary raw material and is a separate operating division of Container. The personnel at the Plastics Division, however, are responsible for the hiring of wage roll persons at Heisler Compounding and for the selection of shift foremen at Heisler. The company has a bidding procedure whereby a person is able to go from a wage roll position in Heisler Compounding to a wage roll opening in Plastics and vice versa. In one instance a shift foreman for Plastics was selected from the wage roll employees at Heisler.

The wage roll employees in Plastics and Heisler Compounding are supervised by shift foremen. This first line supervision is selected from the wage roll ranks unless no qualified candidate is found there in which event management goes outside to fill the post. Shift foremen are supervised by general supervisors who are selected in the first instance from the ranks of shift supervisors.

In 1958, there were between 75 and 80 wage roll employees in the Plastics Plant and Heisler Division. This group was predominantly black. There were five foremen and one general foreman, all of whom were white. By 1964, when Container acquired its Wilmington facilities from Delaware Barrel and Drum, there were approximately 190 to 200 wage roll employees of whom about 40% were black, 40% were of Spanish origin and 20% were white. At this time there were a total of 18 to 20 foremen and general supervisors. Two of the shift foremen were black and the remainder of these supervisory personnel were white.

By 1970, there were approximately 180 wage roll employees of whom 44% were black, 29% Spanish, and 27% white. Of the 14 shift foremen, three were black and 11 white. All five of the general supervisors were white. Finally, by the time of trial in 1976, there were approximately 150 to 160 wage roll employees and the racial mix had

remained relatively constant. There were 13 shift foremen, of whom 5 were black and the remainder white. The general supervisory staff of 7 remained all white.

## LIMITATIONS

We are confronted at the outset by several limitations issues. The positions of the parties with respect to these issues reflect a difference of view that permeates the briefing on almost all issues. Container views the case as one in which three black employees complain of being passed over for promotion on several occasions because of their race. It analyzes the various occasions on which shift foremen openings occurred and points out that, if plaintiffs' allegations be accepted, there were no passovers of plaintiffs Robertson or Stallings within 210 days of the filing of their complaint with the EEOC and no pass-over of plaintiff Tolbert, who filed no EEOC complaint and here presses only a claim under 42 U.S.C. § 1981, within three years prior to the filing of his claim in this Court. Accordingly, Container asserts that Robertson and Stallings are barred by Section 706(d) [now 706(e)] of Title VII, 42 U.S.C. § 2000e–5(d) (1964) [now 2000e–5(e)], and that Tolbert is barred under 10 Del.C. § 8106.[1]

Plaintiffs do not argue with Container's factual analysis of available openings or with its calculation of the various limitations periods. They deny, however, that this is "the kind of case where an employee is claiming an individual incident of racial discrimination".[2] Rather, plaintiffs assert that they are here attacking a promotion procedure which has operated to their prejudice in the past and which, unless enjoined by the Court, will continue to operate to their prejudice in the future.

I conclude that the claims which plaintiffs press are not time barred. Plain-

tiffs have a right to structure their own claims. While it appears that they may be barred from litigating disparate treatment claims relating to individual personnel decisions of Container, this does not mean they have no remedy if their employment condition was affected at the time of the filing of their respective complaints, and continues to be affected, by a promotion procedure which has a disparate impact on people of their race and has no business justification. Contrary to Container's suggestion, there is no rule which limits plaintiffs who do not represent a class to a disparate treatment theory.[3] Disparate impact cases can be pursued by individual plaintiffs,[4] just as named plaintiffs in disparate impact class actions press individual claims on their own behalf as well as on behalf of the members of the class.

## THE CHALLENGED EMPLOYMENT PRACTICE

Plaintiffs' case in chief established that no notice of shift foreman openings is posted by Container and that there is no established procedure by which interested wage roll employees can apply or bid for these first line supervisory positions if they become aware of an opening through the grape vine. Plaintiffs further established that there are no written job qualifications or criteria for shift foremen.

Nor is there any systematic review or evaluation of the performance or qualifications of wage roll employees on an on-going basis or at the time a shift foreman position opens up. While there is "no set procedure", when openings occur, recommendations are customarily made to the plant manager by the personnel director and by the general supervisor and shift foremen within the department. Normally, they look first within the department itself, but they recommend wage roll people from oth-

---

1. See *Marshall v. Electric Hose & Rubber*, 68 F.R.D. 287 (D.Del.1975).

2. Pl. Reply Brief p. 2.

3. For further exposition on the disparate treatment-disparate impact dichotomy see *International Brotherhood of Teamsters v. U. S. et al.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 n. 15 (1977) and *Schlei and Grossman, Employment Discrimination Law* pp. 1–12 (1976).

4. *E. g., Coppersmith v. Roudebush*, 170 U.S. App.D.C. 374, 517 F.2d 818 (1975).

er departments as well. The ultimate decision is reserved to the plant manager. Mr. Kilpatrick, Container's plant manager since 1968, testified that he would "mentally review" the hourly people within the plant and compare their qualifications "against the qualities that . . . were necessary for the opening".[5] According to Mr. Kilpatrick, the criteria for making the decision are leadership ability, experience, technical knowledge, general intelligence, general business acumen, and past job performance. No particular weight or priority is assigned to any of these criteria. Apart from the determination of whether a wage roll employee has the technical knowledge required for the job, or could readily obtain it by job training, the remainder of the decision is a "subjective" judgment call. Given this procedure and the number of wage roll employees, I think it apparent that the recommendations of the general supervisors and shift foremen necessarily play a substantial roll in most promotion decisions. Throughout the relevant period all of the general supervisors and a substantial majority of the shift supervisors have been white.

5. Mr. Kilpatrick's trial testimony was as follows (T. 229–230):

A The policy of the company has been to fill a position with the best qualified individual available at the time; if possible, to fill it from within.

Q Okay. And, as I understand it, if there was a position open in 1970 the company would first look to all the wage roll employees before it looks outside?

A Generally I've reviewed, if not formally, the records of, but mentally at least, the hourly people within the plant and also compared that against the qualities that I felt were necessary for the opening at the time.

Q Again, if I understand correctly, the procedure is that if there is an opening, let's say in Gyro, that the first person to put any input is going to be the general supervisor at Gyro and maybe some of the other foremen who might know somebody who might be possibly a prospect for this position?

A It's a common practice to obtain the advice and information available from the general supervisor and the other shift supervisors within the department.

Q And, as I understand it, they first look to their own department to see if there is someone within that department who might be supervisory material?

This evidence establishes that the procedures utilized by Container in selecting first line supervisors from its wage roll employees leave ample room for the operation of racial bias to the prejudice of blacks. A number of courts have noted the potential for disparate impact inherent in similar "grape vine", subjective criteria promotion practices.[6] The hazard in such a system to members of the black wage roll population is two-fold. Black stereotype impressions held by white supervisors may result in qualified blacks simply being overlooked and never seriously considered for promotion. Or if a black is considered, the ultimate comparisons with others and "judgment" calls which necessarily occur at various points up the line of command may be tainted with bias.

It is, of course, not enough for plaintiffs to show that their employer's practice leaves room for the operation of racial bias. They must persuade the Court that, in operation, it in fact has a disparate impact upon employees of their race. Plaintiffs have attempted to do this in two ways: by describing their own experience with this sys-

A I would say that's the general practice, but that is not necessarily confined only to their own department.

Q So you can go outside the department and look into other departments for someone who might be the kind of person you think would do the job?

A It's uncommon to do that, but it is possible.

Q And after the shift supervisors and the general supervisors have sort of reviewed this, then, as I understand it, it kind of goes up the line until it finally gets to you; is that correct?

A It's difficult to say, sir. There is no real set procedure for this. The kind of thing that you're talking about does happen, but it's not necessarily a set procedure.

Q But, in any event, the decision is ultimately made by you?

A Yes, sir.

6. E. g., Rowe v. General Motors Corporation, 457 F.2d 348 (5th Cir. 1972); Baxter v. Savannah Sugar Refining Corporation, 495 F.2d 437 (5th Cir. 1974), cert. denied 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974); Barnett v. W.T. Grant Company, 518 F.2d 543 (4th Cir. 1975).

tem and by offering statistical data concerning the black population of the pool from which candidates for supervisory positions come and the black population of those selected for those positions.

## THE NON–STATISTICAL CASE

Plaintiffs' evidence showed that when Container acquired its Wilmington facilities from Delaware Barrel and Drum in 1964, plaintiff Robertson had eleven years of employment experience in those facilities, nine years as a machine operator in the Production Department (the predecessor of Gyro and Tank) and two years in the Shipping Department (predecessor of Material Handling). He was a high school graduate, had two years of additional employment experience with another employer, and had served as Chief Shop Steward and Shop Chairman for four years. Between 1964 and 1970 he had accumulated six additional years experience in Material Handling. In 1969 he was elected president of the local union.

In 1964, plaintiff Stallings had been employed for six years, two as a molding machine operator in Blow Molding and four years as a quality control inspector in Quality Control. As of that time he had been a Chief Shop Steward for four years. His prior experience included ten years in the Navy and two years with another employer. By 1970 Stallings had accumulated an additional year's experience in Quality Control and five years in the Maintenance Department.[7]

Both Robertson and Stallings testified that they did not have the requisite technical knowledge to perform as supervisors in the Maintenance Department because of the machine repair responsibilities of that Department. They also testified, however, that they had the necessary knowledge to serve as shift foreman in Gyro, Blow Molding, Heisler, Material Handling, Tank and Quality Control.

Defendant countered this testimony with that of Mr. Kilpatrick. He testified that Robertson was qualified in 1971 to be a shift foreman in Material Handling and Gyro and that he had been offered those positions in 1971.[8] He expressed the general opinion that Robertson did not have the requisite background knowledge for a shift foreman's position elsewhere. The basis for this opinion was developed with some specificity with respect to the Blow Molding and Maintenance Departments but was not persuasively developed with respect to the other phase of Container's operations.

With respect to Stallings, Kilpatrick explained that he had been in the Maintenance Department for the last ten years and did not have the requisite technical knowledge to be promoted in that Department. Kilpatrick also explained that the knowledge Stallings had gained in Blow Molding was now obsolete because of recent technological developments there.

There are two important things to note about Container's evidence regarding Robertson and Stallings. First, Kilpatrick gave the lack of requisite job related knowledge as the sole reason for their not being appropriate choices for shift foreman positions. Second, neither Kilpatrick nor any other defense witness testified that Robertson or Stallings had been *considered* for a shift foreman position prior to 1971.

The evidence supports Container's position that supervision of the operations of the Maintenance and Blow Molding Departments required knowledge which neither Robertson nor Stallings possessed.[9] Accordingly, I conclude that they were not qualified for supervisory positions in those Departments. On the other hand, I find no reason to disbelieve the testimony of Robertson and Stallings that they have the requisite knowledge to perform as shift foremen in Material Handling, Gyro, Quali-

---

7. I have not recounted the employment experience of plaintiff Tolbert because his own testimony provided adequate explanation of why he had not been considered supervisory material by management. E. g., T. 305–308.

8. See pp. 522–23, *infra*.

9. Moreover, I reach the same conclusions with respect to the Tank Department which had only a single General Supervisor.

ty Control and Heisler. Since lack of knowledge is the only reason offered for their being unqualified, I conclude that they were qualified for these positions by 1964. There is specific and direct confirmation of this in Robertson's case. Container acknowledges that he was qualified to assume a shift foreman role in Material Handling and Gyro in 1971 and his experience in the interim does not suggest the acquisition of significant new expertise of a relevant character. Moreover, the evidence convinces me that if Robertson was capable of mastering the Gyro position with "on the job training" like that offered to others, he was capable of mastering Quality Control and Heisler as well.

■ This finding that Robertson and Stallings were qualified for a number of shift foreman positions as early as 1964 would not alone entitle them to relief. An employer is obviously not required to promote all who may be qualified for promotions. But this is not all that plaintiffs have demonstrated. They have established that between 1964 and 1971 when Robertson was first offered a shift foreman position, Container, in the course of filling five shift foreman positions for which he and Stallings were qualified, twice went to the outside and hired new men with no experience at Container.[10] Moreover, between 1971 and the date of trial, Container went to the outside to fill shift foreman positions in the relevant departments on three additional occasions.[11] This is significant because Container's policy was to look to its wage roll employees in the first instance and to go outside only if its grape vine procedures did not turn up a qualified candidate in that pool. The reasonable inference is that Robertson and Stallings were not identified and considered for these openings.

In addition, plaintiffs have shown that in terms of the two objective criteria utilized by Container—relevant prior experience and job knowledge—they were better qualified than the three white wage roll employees who were promoted to shift foremen in relevant departments between 1964 and 1974.[12] This does not necessarily mean that Robertson and Stallings were, on an overall basis, the best qualified of this group for shift foreman positions. I think the evidence was enough, however, to call for the employer to come forward with evidence that Robertson and Stallings were considered and found less qualified with regard to the subjective criteria employed by Container. The failure of Container to do so lends support to the inference that no serious consideration was given to Robertson and Stallings prior to the filing of this suit.

■ In sum, the non-statistical evidence persuades me that two black wage roll employees, whose experience with the company would appear to make them logical choices for promotion to shift foreman positions, were passed over a total of five times in Robertson's case and a total of eight times in Stallings' case. In addition, I find it more probable than not that a promotion procedure reasonably calculated to identify qualified candidates and objectively scrutinize the relative merits of those identified would have resulted in Stallings and Robertson receiving promotions prior to 1971.

## THE STATISTICAL EVIDENCE

■ The raw statistical data presented by the plaintiffs suggests that whites have been overrepresented in the ranks of shift foremen at Container during the 60's and 70's. I conclude, however, that there is no statistically significant data which indicates

10. Dan Reed, Quality Control, 1965; Joe Williams, Material Handling, 1968.

11. Joseph Price, Material Handling, 1972; Jim Brittingham, Heisler, 1973; and Jan Klair, Gyro, 1974.

12. Frank Mitchell, Heisler, 1964 (one year prior experience with company as machine opera-

tor—background primarily in the mortician field); Warren Lindemuth, Heisler, 1965 (two years prior experience with company as machine operator); Charles Mitchel, Gyro, 1969 (three years experience with company as machine operator, one year as leadman, background in police work).

that the employment practice here under attack has a disparate impact on blacks.

There are two basic problems with plaintiffs' statistical case, neither of which appear to be due to any deficiency in the development of plaintiffs' case. First, the number of relevant employment decisions made by Container during this period provide too small a sample from which to draw reliable conclusions. Plaintiffs' expert, Dr. Siskin, testified for example:

> . . . [F]rom a pragmatic viewpoint, when we are dealing with small numbers, people, and we know it is not a perfect random experiment, and one person would change the decision from a fair percent to an unfair percent, I personally have reservations on dealing with very small samples. I have generally used a courtroom guideline that I never test things with less than ten.[13]

See also Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974).

Second, not all disparities between the black portion of those chosen for supervisory positions and the black portion of the pool of candidates are significant. In any racially neutral selection process one would not expect to get racial representation precisely equal to the portion of racial groups in the pool. Thus, plaintiffs' expert, following the lead of the EEOC[14] testified that he would not express a professional judgment that race was a factor in a selection process unless the chances of producing the observed result, absent the presence of a race related factor, were less than 5% or five chances out of 100. If one adopts this standard or level of confidence, the relevant statistical data in this case, when properly analyzed, does not produce statistically significant results.

Plaintiffs' statistical analysis focused on 1970, the year in which this suit was commenced. The record shows that in this year the wage roll work force totaled about 180

employees of whom 44% were black, 29% were Spanish and 27% were white. There were at that time 20 people serving as either shift foremen or general supervisors. Of this group, 12 had been promoted from the wage roll ranks and eight had been hired on the outside. Three of this group were black and the remainder white.

Dr. Siskin was asked to assume this fact and to further assume that Container looks first to its wage roll ranks for qualified shift foreman candidates and to its shift foreman roll for qualified General Supervisor candidates. Based on these assumptions he testified that the chances of selecting 9 white supervisors in the course of filling 12 supervisory positions by promotion from within, if the selection process were independent of race, was .007, or roughly 7 chances out of 1,000. He further testified that if race played no role, the probability of selecting 8 whites in the course of filling 8 positions from the outside, using various figures from 8% to 16% for the relevant outside black population, ranged from 67% to 8%. He concluded that there was no statistically significant evidence that the process of selection from the outside was influenced by race, but that there was strong statistical evidence that some factor related to race played a role in the promotion process. I conclude, however, that this analysis is flawed, primarily by the failure to distinguish between shift foreman and General Supervisor promotions, and that it ignores other relevant data.

The available data indicates that of the shift foremen serving at the end of 1968, 9 had been promoted from the wage roll ranks and of these, 4, or 44%, were black. Of those serving as shift foremen in 1970, 8 had been promoted and 3, or approximately 40%, were black. Of those serving in 1976, 7 had been promoted of whom 4, or 57%, were black. Finally, of the 7 people promoted from wage roll to shift foremen between 1966 and 1976, 2, or 29%, were black.

**13.** T. 447.

**14.** See EEOC Guidelines, 29 C.F.R. § 1607.-5(c)(1) (1975). See also Schlei and Grossman, Employment Discrimination Law, at 1188–1191. Cf. International Brotherhood of Teamsters v. U. S. et al., supra.

While Dr. Siskin was not asked to calculate, for each of these sets of data, the probability that the particular result would have occurred absent race as a factor, it can be inferred from his testimony that in no instance would his analysis produce a statistically significant result.

While these samples are small and statistically insignificant in their own right, they do indicate that the statistically significant results reached in Dr. Siskin's composite analysis are attributable to the inclusion of the decisions regarding promotion from the shift foreman ranks to General Supervisor positions. Of the seven General Supervisors serving in 1970, four had been promoted from shift supervisor and none of these were black. Given the small sample of promotion decisions, the inclusion of this group had a significant impact on the result.

We know very little about Container's practices in selecting General Supervisors, other than that they have traditionally come from the ranks of the shift foremen and that those General Supervisors whose backgrounds are evidenced in the record generally had qualifications at the time of their elevation substantially superior to those who have been promoted to shift foremen at the time of their promotion. While there is some suggestion that the general criteria of knowledge and leadership, etc. may be applied it seems apparent that a substantially different standard of quality and experience is utilized. Moreover, it can also be inferred that, if the informality of the shift foremen promotion practice in fact carries over to the selection of General Supervisors, it may well work with a different dynamic in the context of the limited pool of shift foremen and increased exposure between the members of that pool and the decision maker. The point, however, is that it is a different process and that to the extent one can tell anything from the small samples of promotion decisions available, the results of one process seem to be describing a different phenomenon than the results of the other. To be sure the underrepresentation of blacks is more pronounced in the General Supervisor ranks but nothing in the record suggests to me that any conclusion can fairly be drawn from the limited sample of decisions in this area.[15]

In short, the limited data regarding the promotion of wage roll employees to shift foremen does not provide substantial evidence that the selection process has a disparate impact upon blacks. While plaintiffs have analyzed the data to produce what purports to be statistically significant results, they have done so only by including the results of a distinct promotion process which, based on the record as a whole, I conclude can tell us little about the impact on blacks of the promotion practice to which these plaintiffs have been exposed.

### CONCLUSION RE: LIABILITY

Ordinarily a plaintiff's statistical evidence plays a major role in disparate impact cases. If there is statistically significant evidence of disparate impact, absent a showing by the employer of business necessity or the like, the plaintiff is entitled to relief. Plaintiffs in such cases are not limited to statistical proof, however. If a plaintiff can show a pattern of individual employment decisions made pursuant to the challenged practice in which qualified blacks are consistently passed over in favor

---

15. In fact, the record suggests that it was the relative inexperience of blacks in shift foreman positions prior to the time Container took over the business which resulted in the overrepresentation of whites in general supervisor positions in 1970. In 1970 the four white general supervisors who achieved that status by promotion were promoted from shift foreman pools which ranged from 0% black in 1959 to 29% black in 1965. When two of these four were promoted in 1965, the 29% black segment of the shift foreman pool was comprised of four blacks, one of whom had become a shift foreman in that year, one of whom had become a shift foreman in 1964, and one of whom had become a shift foreman in 1963. While these facts may suggest that the shift foreman promotion procedure administered by Container's predecessor, Delaware Barrel and Drum, prior to 1962 had a disparate impact upon blacks, I am not prepared to say that such a finding would impose upon Container a duty to select general supervisors from candidates having no supervisory experience as shift foremen.

of whites with equal or poorer qualifications, an inference of disparate impact could properly be drawn even though a comparison of the overall results of the practice with what one would expect from a random selection does not produce statistically significant results.[16] The difficult question presented by this record is whether the plaintiffs' evidence regarding their own experience with the system demonstrates a pattern which, without statistical support, carries their burden of showing disparate impact.

Plaintiffs have shown that they are long term black employees with sufficient experience to make them apt candidates for promotion and that they have been passed over on a significant number of occasions when a more efficient and objectively applied selection process would have resulted in their promotion. To be sure this does not mandate a conclusion that the selection process has a disparate impact upon blacks. Some blacks have been selected by the process and it is conceivable, though it has not been proved, that some whites with plaintiffs' qualifications have also been overlooked during the same period. Given an employer's natural self interest in finding qualified supervisory personnel among its employees, however, I think it unlikely that this employment practice would have survived for over seventeen years at Container if its efficiency in identifying qualified white employees were no better than the efficiency which has been demonstrated with respect to blacks.[17]

In summary the record reveals (1) the existence of an employment practice leaving ample room for the exercise of conscious and unconscious bias by predominantly white supervision, (2) a pattern of five pass-overs in Robertson's case and eight pass-overs in Stallings' case during a period in which they were not only qualified for the openings but logical choices by reason of their long experience with the company, (3) the absence of any reasonable explanation for these pass-overs other than that plaintiffs were simply overlooked and not seriously considered. And I conclude that this absence of serious consideration is more consistent with the conclusions that racial bias has played a role in the process of identifying shift foreman candidates for serious consideration than it is with a conclusion that the challenged practice operated equally to the detriment of white and black wage roll employees alike.

The remaining question is whether it has been demonstrated that the challenged practice is dictated by the requirements of shift foreman jobs or is otherwise necessitated by the circumstances of the employer at this facility. Clearly the answer must be in the negative. There simply is no apparent reason why a shift foreman selection process which eliminated the risk inherent in the present system would not serve Container's interests as well or better.

16. A statistical analysis of the type here presented does not take into account the qualifications of those comprising the universe and is of probative value only if there is a sufficient quantity of promotion decisions to make it highly unlikely that the observed result would have occurred solely for reasons unrelated to race. An examination of a series of specific promotion decisions against the background of the qualifications of the various individuals involved entails a different evaluative process. Where the evidence shows a significant number of pass-overs of blacks who are equally or better qualified than those promoted, the record may support an inference of disparate impact even though a grosser statistical analysis does not.

17. When evaluating the significance of a series of pass-overs of qualified blacks, the most relevant question would appear to be not whether there are other blacks who have been promoted, but rather whether there have been pass-overs of whites similarly situated with respect to their relative qualifications. Evidence of such pass-overs would tend to negate the inference of disparate impact by suggesting that the black pass-overs resulted from a promotion system, which though inefficient, operated to the disadvantage of all qualified employees. Instances of black promotion, on the other hand, may simply indicate that the system, although biased, did not operate to the detriment of those particular individuals. This record contains no evidence of pass-overs of white employees similarly situated with plaintiffs Robertson and Stallings.

## REMEDY

■ It is the purpose of Title VII "to make persons whole for injuries suffered on account of unlawful employment discrimination". *Albemarle Paper Co. v. Moody*, 422 U.S. 405 at 418, 95 S.Ct. 2362 at 2372, 45 L.Ed.2d 280 (1975). The Act gives the courts broad powers to fashion the relief necessary to accomplish that end. Title 42 U.S.C. § 2000e–5(g) provides, *inter alia*:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

Back pay should only be denied "for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination". *Albemarle Paper Co. v. Moody*, 422 U.S. at 421, 95 S.Ct. at 2373.

■ Defendant's discriminatory promotion practices resulted in Stallings' failure to receive a promotion to shift foreman in the Quality Control, Material Handling, Heisler, or Gyro Departments despite the fact that he has been qualified for such a promotion since 1964. To compensate him for injuries suffered as a result of this discrimination, therefore, Stallings is entitled to be offered the next shift foreman position which comes open in any of these departments. Furthermore, he is entitled to back pay equivalent to the difference between what he has earned and what he would have earned had he been promoted to shift foreman. The one proviso, of course, is that any such back pay award can only accrue from a date two years prior to his filing the charge with the EEOC on March 29, 1970.[18] Thus, Stallings will be entitled to an award of back pay to compensate him for earnings lost as a result of his failure to receive a promotion to shift foreman for the period from March 29, 1968 until he is offered such a promotion in any of the relevant departments.

■ Defendant's discriminatory practices similarly resulted in plaintiff Robertson's failure to receive a promotion to shift foreman in the same departments despite his qualification for such a position since 1964. But I conclude that he is not entitled to receive first consideration for the next shift foreman opening nor is he entitled to receive as extensive an award of back pay as is plaintiff Stallings. On February 22, 1971, Robertson was offered a promotion to shift foreman which he turned down because he would lose the protection of the seventeen years of seniority he had earned with Container. He has subsequently refused to accept a promotion for the same reasons.[19] Thus, as of February, 1971,

18. Plaintiff does not specifically request an award of retroactive seniority. In any case I conclude that Container has no seniority system applicable to its supervisory staff and consequently no such award would be appropriate.

19. Plaintiffs' brief argues that Robertson was justified in refusing these offers of promotion because they were not accompanied by an offer to pay the back pay which he had sought in this suit. The answer is two-fold. First, as a matter of fact, I am convinced that Robertson's refusals were motivated by his unwillingness to give up his wage roll seniority, as he testified at trial, and that he would not have accepted these positions even if back pay had been offered. Second, acceptance would clearly not have rendered his back pay claim moot, and I see no reason why he could not have accepted the positions if he wanted them and continued to pursue that claim in this Court. It would be unwise, I believe, to hold that one offered a promotion during the pendency of a Title VII case has no duty to mitigate his damages by accepting the offer.

523

Robertson's failure to receive a promotion was not due to Container's discriminatory promotion policy, but rather to his lack of interest in the position. Making Robertson whole for injury suffered as a result of defendant's discriminatory practices, involves simply the award of back pay from March 29, 1968 to February 22, 1971, the date he first refused a promotion offered to him. What was said by the Supreme Court in *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 370, 97 S.Ct. at 1872, is equally applicable here:

> To the extent that an incumbent was deterred from applying by his desire to retain his competitive seniority, he simply did not want a line-driver job requiring him to start at the bottom of the "board". Those nonapplicants who did not apply for transfer because they were unwilling to give up their previously acquired seniority suffered only from a lawful deterrent imposed on all employees regardless of race or ethnicity. The nonapplicant's remedy in such cases is limited solely to the relief, if any, to which he may be entitled because of the discrimination he encountered at a time when he wanted to take a starting line-driver job.

I conclude as well that defendant should be enjoined from utilizing its current procedures for selecting shift foremen. Container will be directed to develop and, following Court approval, institute a new shift foreman promotion procedure which will guard against the hazards identified herein. That procedure should involve the posting of notices of shift foreman openings along with descriptions of the qualifications required for the job. It should also include a bid procedure and a procedure for rating applicants with respect to both the objective and subjective criteria utilized by the decision-makers. Provision should also be made for recording those ratings to facilitate subsequent review.

Finally, I conclude that an injunction requiring the institution of training programs along the lines requested by plaintiffs would not be appropriate. The record does not reflect that blacks suffer a disparate impact from Container's promotional system because they have less opportunities to develop the qualifications necessary for promotion to shift foremen. To the contrary, the evidence reflects that the disparate impact results from Container's failure to identify blacks who in fact qualify.

Submit order.