**William WALKER, Plaintiff,**

v.

**ROBBINS HOSE COMPANY NO. 1, INC. and Ronald E. Dear, Fred Seamans, Narty Garrison, Carleton Dill, Raymond Osika, Individually and as directors of Robbins Hose Company No. 1, Inc., and Harry T. Pusey, William C. Hamilton, Charles H. Boyer, and Samuel Heite, Individually and as officers of the Robbins Hose Company No. 1, Inc., Defendants.**

Civ. A. No. 74–172.

United States District Court,
D. Delaware.

Feb. 8, 1979.

John S. Grady, of Bader, Dorsey & Kreshtool, Dover, Del., for plaintiff.

Nicholas H. Rodriguez, of Schmittinger & Rodriguez, P.A., Dover, Del., for defendants.

## OPINION

LATCHUM, Chief Judge.

William Walker ("plaintiff"), a black citizen, brought this action against the Robbins Hose Fire Company (the "Fire Company") and its directors and officers, alleging that they had denied his application for probationary membership on the basis of race and that the Fire Company's recruitment, application and membership processes are racially discriminatory.  The plaintiff insti-

tuted the suit as a class action, and on November 24, 1975, the Court conditionally authorized him to proceed on behalf of all similarly situated "black person of eligible age residing in the Dover, Delaware area."[1] Two years later, however, the Court decertified the class action aspects of the case because the plaintiff had failed to satisfy the numerosity requirement of Rule 23(a)(1), F.R.Civ.P.[2] In another Memorandum Opinion and Order, filed December 28, 1976, the Court denied the plaintiff's motion for summary judgment on the issue of liability, but held that the policies, procedures and practices of the Fire Company in connection with the selection of new members constituted state action within the meaning of 42 U.S.C. § 1983.[3]

Initially, the plaintiff asserted claims for damages, as well as declaratory and injunctive relief, under 42 U.S.C. §§ 1981, 1983, 1985 and 2000d.[4] He also demanded a jury trial. At the pre-trial conference, however, the plaintiff elected to proceed to trial only on his claims of discrimination based on 42 U.S.C. §§ 1981 and 1983. He dropped all other causes of action and abandoned his claims for monetary damages.[5] Because the plaintiff had confined his request for relief to an injunction (1) requiring the Fire Company to grant him probationary membership and (2) prohibiting future use of discriminatory personnel procedures, the Court determined that the parties were not entitled to a jury trial.[6] A three day trial to the Court commenced on June 19, 1978 and the case is now ready for final disposition.[7] This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a), F.R.Civ.P.

## I. BACKGROUND FACTS

### A. Historical Background

The Robbins Hose Fire Company was founded in 1882 and since that date has provided fire fighting protection and services to the Greater Dover area. (PX 11). All members of the Company are volunteers who receive no monetary compensation whatsoever for their services as fire fighters. (PX 11). The Fire Company relies upon donations from the community and appropriations from the State, County and City governments to finance the purchase of its equipment and to sustain its operations. Indeed, more than one-half of the Company's regular income comes from governmental sources. (PX 11; PX 3, ¶ 6).[8]

The Fire Company is incorporated under the laws of Delaware; its corporate officers include a President, Vice President, Secretary and Treasurer. (DX 8). These officers together with the Board of Directors manage the Company's administrative affairs. The Company also has several operational officers, whose duties are spelled out in the Dover City Charter. (PX 2, §§ 2–51, 2–52, 2–53). The Fire Chief is the principal officer and has full control of the Company at all fires. The Charter also provides that: "The City Council shall have general control of the Fire Department and shall enact rules and regulations to govern its conduct." (PX 2, § 2–46). Based on these and other facts recited in an earlier opinion, the Court has found that "the conduct of the

---

1. Docket Item 39. The class designation was amended shortly thereafter. Docket Item 41.

2. *Walker v. Robbins Hose Fire Co. No. 1, Inc.*, 76 F.R.D. 218 (D.Del.1977).

3. Docket Items 59 and 60.

4. Docket Item 1. The claim based on 42 U.S.C. § 2000d was added by way of an amendment to the complaint. Docket Item 39.

5. Docket Item 83. Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1343(3) and (4).

6. Docket Item 82.

7. The evidentiary record was supplemented by stipulation of the parties on January 10, 1979. (Docket Item 96).

8. For at least 25 years, the City of Dover has supplied the Fire Company with dispatchers, who are assigned to the Fire Station, receive all alarms, dispatch the equipment and serve as custodians for the building. The dispatchers are employees of the City of Dover. (PX 3, ¶ 2).

Company in general and its membership policies in particular must be regarded as state action." (Docket Item 59, p. 17).

The Fire Company has never recruited members in its entire history; an applicant has always been expected to step forward on his own and volunteer his services. (PX 1, Answer to Interrogatory No. 17). There are three types of members: auxiliary, probationary and life members. Auxiliary members are between the ages of 16 and 21 and serve under the direct supervision of the Fire Chief. (Hamilton, A–9, 10).[9] In February 1974 there were seventeen auxiliary members. (PX 1, Answer to Interrogatory No. 36). Persons over 21 years of age who apply and are accepted are placed on probation for a period of one year. During that year probationary members must attend at least five-sixths of the regular meetings of the Company, the same percentage of all fire schools, and two-thirds of all alarms of fire, or furnish a reasonable excuse for failing to do so. (PX 3, By-Laws, Art. XVIII, Sec. 5). To become a life member of the Fire Company a person must successfully complete the one-year probationary period, pass examinations in salvage, first aid, and general fire fighting with grades of 75 percent or more in each, and finally, receive the approval of either the investigating committee or a majority of the life members present and voting at the next regular meeting. (DX 8).

The original by-laws of the Company, adopted December 11, 1882, limited membership to "respectable white male[s]." On June 27, 1960, the requirement that an applicant be white was deleted. (DX 7, p. 17). In February 1974 when the plaintiff applied for probationary membership, the applicable provision read as follows:

> Any respectable citizen residing in the City of Dover or Robbins Hose Company fire district and [sic] is twenty-one (21) years of age, may apply for membership in the Company. . . .

(PX 3, Art. XVIII, Sec. 1). The Fire Company has never publicized the fact that its by-laws no longer exclude blacks from membership. (PX 1, Answer to Interrogatory No. 16). In 1960 when the change was made, however, a local newsman reported it over a local radio station and in the local newspaper. (DX 21 (McSherry dep.), p. 8).

No black expressed an interest in applying for membership in the Fire Company until the latter part of 1973, when three blacks, including the plaintiff herein, requested and obtained applications. (DX 1). None of those applications were returned to the Company with the requisite ten dollar application fee, however. (DX 1). Thus, the plaintiff Walker became the first black actually to apply for membership when he submitted his application with the fee on February 4, 1974. (DX 1).

In 1973 the Company received a federal revenue sharing grant through the City of Dover in the amount of $600,000 to be used for renovating and adding to the fire house. (PX 3, ¶ 1). Upon hearing of the proposed revenue sharing grant, Wilbert L. Cooper, president of the Central Delaware Branch of the NAACP, filed a complaint with the Office of Revenue Sharing contending that the Fire Company discriminated against blacks. (Cooper, B–41, 58). Thereafter, the Office of Revenue Sharing halted the funding of the project and instituted an investigation. (Pusey, A–178). As a result of the investigation, the Company was asked to amend certain portions of its constitution and by-laws. (Pusey, A–178). The Company agreed to make the suggested amendments and formally adopted them on April 1, 1974. (Pusey, A–178; DX 8). Soon after the federal funds were restored, Walker's application for probationary membership was rejected and Cooper filed another complaint alleging racial discrimination with the Office of Revenue Sharing. (Cooper, B–59; DX 14). During the pendency of the second investigation, the federal funding was again halted. (Pusey, A–179). The office of Revenue Sharing eventually re-

9. Reference is to the Trial Transcript (Docket Item 85) by witness, volume of the transcript and page.

sumed the funding and the building program was completed. (Pusey, A–179).[10]

Between the time of Walker's rejection and the trial in this case, four other black persons applied for membership. The Company accepted all four blacks as probationary members, but none of them became life members. Thus, the Fire Company had no black members at the time of trial. Raymond Mitchell, Jr., applied for probationary membership on April 1, 1974, and was accepted on May 6, 1974. (Mitchell, A–146). Five months later, Mitchell resigned because he had moved out of the Robbins Hose fire district. (DX 12). A second black, David Lewis, became a probationary member on May 3, 1974. (Mitchell, A–147). Lewis resigned on December 30, 1974, citing personal problems that caused him to take a second job. (DX 11). Another black, Benny Smith, also voluntarily resigned after being accepted as a probationary member (Mitchell, A–147; Grady Stipulation, A–203). Finally, Carl Williams became a member of the Fire Company in late 1974. Williams did not complete his probationary year because he failed one of the examinations required for life membership. (Boyer, A–205).[11]

In February 1974 when Walker applied for probationary membership, there were approximately 116 life members of the Fire Company in the Dover area and roughly 50 other life members living elsewhere. (PX 1, Answer to Interrogatory No. 36).

## B. *The Challenged Membership Practices*

The plaintiff alleges that the recruitment, application and membership processes of the Fire Company are racially discriminatory. As noted earlier, the Company has never actively recruited members. The record indicates, however, that while no one actively solicits applicants, many of those who have applied have had friends or rela-

tives who are or were members of the Fire Company. (Mitchell, A–118, 119). In 1974 approximately 20 percent of the members were related to each other. (Mitchell, A–97, 98; Kemp, B–21). Family traditions also appear strong; in one case, men from four generations of the same family had served in the Company. (PX 11, pp. 68, 69).

Membership in the Company is open to any respectable citizen who is 21 years of age and resides in the City of Dover or the Robbins Hose Company fire district. When Walker applied, applicants were required to complete a short application, obtain the signatures of three life members and submit the completed application with a $10 application fee. Once received, applications are read at the Company's next regular meeting and then referred to the Investigating Committee. (By-Laws (PX 3), Art. XVIII, Sec. 1). The Investigating Committee, composed of three life members elected annually by the Company, is responsible for making "the most diligent inquiry into an applicant's character and standing in society." The Investigating Committee also arranges for a physical examination of each applicant and presents a report of the physician's findings and their own investigation to the Company at its next regular meeting. (By-Laws (PX 3), Art. VIII, Sec. 1). Among the matters typically examined by the Investigating Committee are: criminal records, employment records, driving records, and previous fire company experience. (Hamilton, A–14, 26). At the time Walker applied, an applicant had to receive a majority vote of the life members present and voting at the meeting to be admitted to probationary membership. (By-Laws (PX 3), Art. XVIII, Sec. 3). Anyone rejected could reapply after the expiration of six months from the date of the rejection. (Constitution (PX 3), Art. VI).

On April 1, 1974, the by-laws pertaining to the application and membership proce-

---

10. No reports or findings by the Office of Revenue Sharing were put in evidence; therefore the Court will draw no inferences concerning the merits of this case from the fact that federal funding was restored.

11. A fifth black, Bruce Hulman, submitted an application for probationary membership on November 10, 1976. (Boyer, A–205). Hulman withdrew his application a few days later, however, citing commitments at work. (Boyer, A–206; DX 13).

dures were amended. (DX 8). The requirement of the signature of three life members was deleted and a new provision was added requiring the Investigating Committee to make a recommendation on each applicant it investigated. The amended by-laws further provided that unless a life member objected to the recommendation of the Investigating Committee on some ground other than race, color, creed, or religion, the recommendation would become final. In the event of an objection, a vote would be taken and a majority vote would be necessary to overcome the Investigating Committee's recommendation. (By-Laws (DX 8), Arts. VIII and XVIII).

### C. *Application of William Walker*

William Walker first obtained an application for probationary membership in the Fire Company in November 1973. Walker submitted the application, but it was later returned to him for failure to forward the required $10 application fee. (Boyer, A–186). Walker did not pursue the application because a death had occurred in his family. (Walker, B–61).

Around February 1, 1974, Walker obtained a second application form which he filled out and returned with the $10 application fee. (Boyer, A–188). The application gave Walker's address, stated his age to be 48, named Playtex Corporation as his present employer, stated that he had been a member of the Belvedere Fire Company, and bore the signatures of three life members. (PX 13). The application was read at the regular membership meeting on February 4, 1974, and turned over to the Investigating Committee. (PX 4, p. 21).

Walker's application received widespread publicity in the community. (Walker, B–92). The local newspaper published an article indicating that Walker was the first black applicant to the Fire Company and that he was a former prizefighter. (Mitchell, A–151, 152; Walker, B–92; Hamilton A–30). The publicity also gave rise to an unprecedented amount of public comment and community input. (Mitchell, A–152).

In February 1974 the Investigating Committee comprised James I. Mitchell, James Melvin, and W. W. Postles, Jr. (PX 1, Answer to Interrogatory No. 2). However, because Postles and Melvin were inactive, the responsibility for conducting the investigation of Walker fell primarily on Mitchell. (Hamilton, A–16). Recognizing that fact and that Walker's application had received widespread publicity and followed closely on the heels of the Office of Revenue Sharing's investigation, the Company's President Harry T. Pusey decided to follow the matter closely. (Hamilton, A–28; Pusey, A–158). When Mitchell scheduled an interview with Walker for February 21, 1974, Pusey asked his Vice President, William C. Hamilton, to attend the interview in his place. (Hamilton, A–28; Pusey, A–158). Although the by-laws provide that the president is an ex officio member of all committees (PX 3, Art. III, Sec. 2), neither Pusey nor Hamilton had previously attended any Investigating Committee meetings in an ex officio capacity. (Mitchell, A–134, 153).

Mitchell and Hamilton interviewed Walker on February 21, 1974. (PX 14). Because the application form requested only the name of Walker's present employer, they asked him to name his prior employers in the Dover area. (Hamilton, A–33, 34; Mitchell, A–139). In response Walker mentioned the Dover Air Force Base and a church in Wilmington. (Mitchell, A–139). Hamilton also testified that he asked Walker whether he had checked with his present employer about attending Fire School and the regular monthly meetings. According to Hamilton, Walker had responded affirmatively. (Hamilton, A–84, 85). Hamilton called the International Playtex Corporation and they denied having been consulted by Walker about the matter. (Hamilton, A–85). Walker recalled the question, but testified that he told the interviewers that he would have to contact his employer. (Walker, B–87). The Court, however, having observed the demeanor of the witnesses and finding the question significant to the defendant, is convinced that Hamilton's

version is correct.[12] It is unclear what other topics were discussed at the initial interview which lasted only about 15 minutes. (Hamilton, A–36). At the conclusion of this interview and on the limited record before them, both Hamilton and Mitchell were willing to accept Walker for probationary membership. (Hamilton, A–81; Mitchell, A–133).

Mitchell wrote to the Belvedere Fire Company for confirmation of Walker's membership in that Company. The only response ever received was an oral statement from the former Chief of the Belvedere Fire Company to the effect that he could not recall Walker ever being a member. (Mitchell, A–137). Walker's own testimony indicates that any experience he may have received on the Belvedere Fire Company was of minimal importance:

Q: Do you recall what Mr. Hamilton asked you about?

A: He just asked me about some things; was I a fireman? I told him I had some little bit of training at the Belvedere Fire Company. It wasn't a certified fire company because it was just a group of men that stood on the corner out there in Belvedere, and they had a little piece of truck. Whenever a fire occurred or something, whoever was around would hop on the truck and go down to the neighborhood, use the hose to try to do our best to get the fire out.

(Walker, B–63).

After the publicity concerning Walker's application, both Hamilton and Mitchell received unsolicited information about Walker from third parties. Hamilton was told by a personal friend of his, William McCabe, that Walker had worked for the State Custodial Department, had been an unsatisfactory employee, and finally, had just walked off the job. (Hamilton, A–79, 80). Hamilton, who understood that McCabe had had some supervisory authority over Walker on that job, accepted McCabe's story without further investigation. (Hamilton, A–80). Someone else told Hamilton that Walker had worked at the National Cup Company. Hamilton called there and was told by an unidentified employee that Walker had been involved in a "horrible incident." (Hamilton, A–83, 84). The employee refused to elaborate and Hamilton did not pursue the matter. A City Police Officer, Robert Konshack, who was a member of the Investigating Committee from 1971 through 1973, informed Mitchell that he had heard that Walker had been dismissed from the security force at Dover Downs Race Track. (Mitchell, A–136, 137). Mitchell relied upon that information. Mitchell's father had worked with Walker at ILC Industries, and he told his son that he recalled Walker's being dismissed.

12. Walker's credibility was drawn into issue at a few points during the trial, and based on the evidence submitted, the Court finds his credibility generally to be very low. When asked at trial whether he had ever filed an employment application indicating that he had children, Walker unequivocally answered no. (Walker, B–121, 122). The defendants then introduced an application for State employment, dated November 21, 1971, in which Walker claimed to have two children. (DX 16, ¶ 6). Walker testified that he falsified that application in order to get the job. (Walker, B–126). DX 18 is an application for employment at Leeds Travelwear, Inc., under the name of William Walker and it indicates two children. Walker denied signing the application, although it apparently bears his signature, and he denied supplying the information for the application although it was a part of his personnel file introduced in the deposition of Robert Morrison, Industrial Relations Manager of Leeds. (Walker, B–130, 131; DX 18; DX 23). A total of five employment applications were introduced into evidence. (DX 15, 16, 17, 18 and 19). One of the applications states Walker had no military service. (DX 16). Walker testified that the statement was correct because he served only in the reserves. (Walker, B–127). The other four applications indicate that he served several years in the Army and was honorably discharged with the rank of sergeant. Walker admitted that the statement in one of the applications was incorrect (DX 19; Walker, B–133); he denied signing two of the other applications (DX 15 and 18; Walker, B–124 and 131); and he could not recall filling out the third. (DX 17; Walker, B–129). These and other inconsistencies developed at trial make the Court extremely reluctant to believe Walker over other witnesses.

Mitchell asked his father to have the personnel director at ILC send him a letter explaining what happened. (Mitchell, A–107). A letter was subsequently received indicating that Walker had worked at ILC Industries, Inc., from May 19, 1969 until August 23, 1969, when he was dismissed for walking off his job without explanation and failing to report to work on the following day. (PX 14). In addition, Mitchell's father told him that the personnel file on Walker described him as a "troublemaker." (Mitchell, A–136).

Walker also worked at the Stevenson House Detention Facility of the Delaware Division of Juvenile Corrections. (DX 22, Exhibit). An employee of Stevenson House, Mrs. Truitt, either directly or through her husband informed members of the Fire Company that Walker had been dismissed as an employee from Stevenson House. (Mitchell, A–140; Kemp, B–34). Mitchell later called Mrs. Truitt, but she refused to give him any more information and suggested that he call Hillard Harrison, a personnel officer with the Division of Juvenile Corrections. (Mitchell, A–140). Mitchell then called Harrison and learned that Walker had indeed been discharged for cause. (Mitchell, A–141, 142). Harrison sent a confirming letter to Mitchell, dated February 14, 1974, which stated that Walker's performance evaluation for the period January to July 1972 had been good overall but that Walker "was terminated from the Division's employ on October 16, 1972 for the use of poor judgment in his conduct towards detainees." (PX 14).

A dispute exists over whether Harrison told Mitchell more during their telephone conversation than was reflected in the confirming letter. Mitchell testified that Harrison told him the following: Walker was accused of writing a soliciting letter to a young female detainee and the possibility of filing charges against him was considered; he steadfastly denied writing the letter but agreed to submit it to a handwriting analyst for examination; the examination

showed that Walker had written the letter; and thereafter he was discharged. (Mitchell, A–105, 106, 141, 142). According to Mitchell, Harrison also mentioned that Walker unsuccessfully had appealed his discharge on grounds of racial discrimination to the Human Relations Commission, the union, and the Governor's Office and that he had yet another appeal pending before the Equal Employment Opportunity Commission. (Mitchell, A–105, 106). Although Harrison did not remember the particulars of the telephone conversation, he doubted that he would have said anything more than what was in the letter. He specifically denied telling Mitchell that Walker had been discharged for sexual conduct toward detainees. (DX 22 (Harrison dep.), pp. 44–45). Having considered all the evidence, the Court concludes that Mitchell's recollection is probably correct. The information Mitchell referred to appears in the Investigating Committee's report compiled shortly after the telephone conversation took place. (PX 14). The accuracy of the information Mitchell recalled is corroborated by the State of Delaware's personnel file on Walker, which was admitted at trial for purposes of testing credibility only. (DX 22, Exhibit). The plaintiff seems to argue that the source of the information in the Investigating Committee's report may have been the newspaper articles written about the Stevenson House incident in 1972 when it occurred.[13] It is unlikely that the report was based on the newspaper articles, and even if it were, the Court fails to perceive how that would have prejudiced Walker.

Finally, the newspaper article about Walker applying for membership prompted Iva Tazelaar of the Dover Housing Authority to speak to Charles Boyer, the Company's Secretary, the next time she visited his store. (Boyer, A–196). Mrs. Tazelaar told Boyer about her experiences with Walker in connection with housing and commented that he would not make a very good fireman. Boyer asked her to submit a letter to the Company and she did. (Boyer, A–196;

---

**13.** The newspaper articles and their contents were common knowledge around the fire house at the time Walker applied for membership. (Mitchell, A–112, 113).

PX 14).[14] Mrs. Tazelaar stated that Walker had falsified several material items on his applications for public housing relating to his income and dependents, and that when these errors were discovered and rectified by increasing his rent, he became angry and moved out of the public housing unit. (PX 14).

These matters caused Mitchell to schedule a second interview with Walker. The interview took place on February 28, 1974, and was attended by Mitchell, Pusey, Hamilton and perhaps Postles. (Mitchell, A–105, 131). When confronted with the names of the employers he had failed to mention at the first interview, Walker replied that he did not feel those employers were important and that they did not count. (Hamilton, A–44, 45; Mitchell, A–142). Walker admitted being fired from Stevenson House, but denied any wrongdoing. (PX 14). At the second interview, the Investigating Committee also reviewed Walker's criminal record with him. (Walker, B–73). A report from the Delaware State Bureau of Identification indicated: that Walker had been arrested in 1944 for violation of 10 U.S.C. § 1393, unlawfully wearing a uniform of the U.S. Army, and that the charge was withdrawn; that he had been arrested in 1954 for assault and battery with no dispo-

sition; and that in 1962 he was held in contempt of court apparently for failing to pay child support. (PX 14). Pusey asked Walker if he knew Wilbert Cooper, who was the current president of the Central Delaware Branch of the NAACP. (Pusey, A–159). Hamilton asked Walker if he frequented any bars; Walker responded that he did not drink or smoke. (Hamilton, A–74, 75).

Mitchell prepared a report and read it at the general membership meeting on March 4, 1974. The report contained the following information: Walker completed high school and two years of college; he had no military service; his present employer was International Playtex Corporation; he was a member of the Belvedere Fire Department in 1951–52 but attended no fire school; he had the criminal record described above; he had received a warning for speeding on June 14, 1972, been convicted of following too closely on August 27, 1972, and been convicted of disregarding a red light on December 17, 1972; and he was 48 years of age. (PX 14). The report also summarized the information gathered about Walker's previous employment experience. The latter portion of the report, together with Mitchell's summary of the two interviews, is set forth in the margin.[15]

14. Pusey and Hamilton interviewed Mrs. Tazelaar in person before she submitted the letter; the letter merely summarized what she told them. (Tazelaar, C–20, 21).

15.　　　　Investigating Committee Report
William Walker

Intl. Playtex – Mike Soroker (Personnel) 674–6133
Hired: 11/7/72
Utility Man – Packaging Department, Second Shift
Supv. Walter Payne 674–6731
Satisfactory Progress Report – Good Worker

State of Delaware – Department of Juvenile Corrections
Hillyard Harrison 998–1196 (2/12/74 4:15 P.M.)
Hired: 1/72 – Dismissed: 10/16/72
Conduct toward young (14–15) female detainee
wrote soliciting letter to young female.
was discharged for using bad judgment towards detainee
also for falsifying application.
made appeal to Human Relations Commission charging racial
discrimination – appeal denied
also appealed to the union – denied
appealed to Governor's office – denied

ILC Industries, Dover, Delaware
Dates of employment unknown
discharged for walking off of job in middle of shift – did
not return to work. Personnel folder indicates Mr. Walker
was a troublemaker.

After Mitchell read the Investigating Committee's report to the membership, Vice President Hamilton spoke against Walker. (Mitchell, A–109). Hamilton described his participation as follows:

I got up and filled in, I think, a few things that may have been omitted in the report that I had heard about Walker—particularly where I felt that he had outright lied to me about his employment or was trying to conceal it because of the, well, poor work record, his lack of dependability. When we look at a man, we want a dependable person, and this certainly was not exhibited on any of the reports on Walker. . . .

(Hamilton, A–54). Thereafter, a motion was made to reject Walker's application for probationary membership. Twenty-seven life members voted in favor of the motion and two abstained. (Boyer, A–198). Walker was notified of his rejection by a letter, dated March 5, 1974, from Secretary Boyer. (PX 5).

On March 6, 1974, Walker wrote to Boyer requesting a written statement of the specific reasons for his rejection. (DX 10). A letter containing a statement of reasons was prepared by Hamilton with the assistance of Mitchell and a Mr. Hill. (Hamilton, A–62; Mitchell, A–119). The Company's Secretary, Boyer, typed the letter and sent it to Walker. (Boyer, A–190). The letter was dated March 13, 1974, and bore the legend *"PERSONAL AND CONFIDENTIAL ONLY FOR THE EYES OF WILLIAM W. WALKER."* (PX 6). The March 13 letter unquestionably represents the official position of the Fire Company. (Pusey, A–166).

The letter, which is set forth in the margin,[16] informed Walker that he had been

---

Note 15—Continued

Leeds Travelwear, Clayton, Delaware

National Cup, Dover, Delaware

Dover Downs, Dover Delaware – Security Force employment terminated

State of Delaware – State Custodial Department discharged for walking off the job

Dover Air Force Base, Dover, Delaware

had first interview 2/21/74

Mr. Walker made no mention of employment at above stated places. When asked a second time, he still did not mention the aforementioned employers.

On 2/28/74 a second interview was held with Mr. Walker. On this occasion he still did not mention the employers indicated until confronted with them. He made no mention of ever having been fired. When asked about the Stevenson Home, he admitted being fired but denied any wrong doing. (PX 14).

---

**16.** The body of the letter reads:

Dear Mr. Walker: Your recent letter requested the specifics regarding the rejection of your application for membership in Robbins Hose Company # 1. We stated in our letter of March 5th that your application was rejected because you "lacked the necessary qualifications." This Company's by-laws require an applicant to be 21 years of age, a resident of Dover or Dover's fire district and must be a respectable citizen. You met the qualifications as to age and residency. The "lack of necessary qualifications" fell under the respectability condition of the by-laws, as your background report was less than that required for membership.

We contend that one who is respectable should be truthful, dependable, obedient, and of good moral character. Unfortunately, these virtues as revealed by the Investigating Committee's report on you were questionable. To wit:

Employment:

When interviewed on February 21st regarding your Kent County employers since residing in Dover, you mentioned only two. Those being DAFB and IPC. The Investigating Committee's report lists five other employers. These are National Cup, Custodian's Office of the State of Delaware, Leeds, ILC Industries and the Department of Juvenile Corrections—Stevenson Home. In three cases it was reported you were discharged for cause from these employers you had failed to mention. However, on February 28th when confronted with these facts you did admit to having worked at these five additional places. This deliberate omission

rejected for failing to meet the "respectability" requirement of the by-laws. Specifically, the letter charged Walker with: (1) falsifying his application for membership by failing to mention several of his previous employers; (2) showing a lack of dependability by walking off the job in two instances; (3) falsifying his application and disobeying orders at the Stevenson Home and writing a solicitous letter to a juvenile female detained there; and (4) falsifying an application for housing filed with the Dover Housing Authority. The letter also stated that Walker's criminal record "provide[d] doubt as to [his] reputation and character" and that his unverified service with the Belvedere Fire Company would not be credited as prior fire service. (PX 6).[17] The Company's reasoning was summarized as follows:

> Your record of not being dependable, not being truthful, of disobeying orders, and of questionable morals, is unaccepable [sic] behavior for Dover firemen.

(PX 6).

At the trial a few members of the Fire Company testified about their reasons for voting to reject Walker. Hamilton based his decision on Walker's lack of dependability, the "morals" questions at the Stevenson Home, Walker's arrest record and the rumors about his causing trouble. (Hamilton,

---

was considered an attempt to cover questionable background data. Certainly an act of falsifying your application for membership. Records show that at ILC Industries and the Custodian's Office of the State of Delaware, you were discharged for walking off the job. Showing you lack dependability. It is record that at the Stevenson Home you were discharged for falsifying your application and disobeying orders, neither respectable acts. Another incident at the Stevenson Home charges you with writing a soliciting letter to a juvenile female, that had been a former inmate. Expert hand writing analysis showed you to have written this letter. Thus bringing doubt on your moral character.

The only favorable comment in the entire report from employers was from IPC, your present employer. They stated you are doing a good job.

Police Record:

Delaware State Bureau # 22570 for William Wayeman Wakefield Walker also provides doubt as to your reputation and character.
  a. Charges involving unlawful wearing of U.S. Army uniform further backs our contention you are prone to falisify. [sic]
  b. Assault and Battery charges, particularly when placed on a professional fighter, raise many serious doubts about your character.
  c. Contempt of Court charges for nonsupport of a child brings additional doubt about your dependability.

Falisifying [sic] Records:

Another incident of falcifying [sic] an application was reported by the Dover Housing Authority when you obtained houseing [sic] by making incorrect statements on the application. The application states you have two children. When in fact you tell us you have none, and they found none.

You used Belvidere [sic] Fire Company as a recommendation to indicate you are an experienced fireman. It is unfortunate that we have had no reply to our request for information about you and your activities there. If you were a member of Belvidere, at the time you state, this could not count as prior service since Belvidere Fire Company was not certified and had no recognized standard of training during the mentioned times.

We insist that a member of the Robbins Hose Company # 1 be respectable and of good character. Every member must be welcome in any home or business in this community. For in fact, at any given momment [sic] a firemen [sic] may be expected to do just that. There can be no question at such time as to his truthfulness, dependability, obedience, or good moral character.

Your record of not being dependable, not being truthful, of disobeying orders, and of questionable morals, is unaccepable [sic] behavior for Dover firemen.

Your application was rejected solely on the afore mentioned facts, that certainly attest you "lack the necessary qualifications." Your rejection was in no way influenced by the fact you are a black man. Mr. Walker, you may be assured, that any applicant, of any race, color, creed or religion with similar background as yours, would not be accepted as a member of this fire department.

We in no way intend to imply this letter covers our entire file on your investigation but only some of the more glaring incidents. Need we say more? This should be adequate documentation, to prove beyond all doubt, you do indeed "lack the necessary qualifications" to be a member of Robbins Hose Company # 1.

(PX 6).

17. The last paragraph of the letter implies there were other reasons for Walker's rejection. (PX 6). In fact there were no other reasons. (Mitchell, A–124, 125).

A–96).[18] Mitchell placed little reliance on the criminal record, but was in general agreement with the letter dated March 13, 1974. (Mitchell, A–121). Boyer based his decision on the Investigating Committee report as a whole. (Boyer, A–199). Chief Kemp did the same. (Kemp, B–35).

Walker instituted this action against the defendants on August 21, 1974. He claims (1) that he was denied probationary membership because of his race and (2) that the recruiting, membership and application procedures of the Fire Company are racially discriminatory. The first claim, which the Court has denominated the plaintiff's disparate treatment claim, is individual in nature and is based principally on Walker's allegations that the Company's membership procedures and criteria were applied discriminatorily in his case. By way of relief, Walker seeks an order directing the Fire Company to expunge the records of his rejection and to instate him as a probationary member. The second claim is much broader and is based on Walker's contention that the Company's membership practices have had a disparate impact on blacks. The relief sought on the second claim would benefit members of Walker's race generally. The two claims and the facts developed in connection with each of them will be discussed in turn.

## II. THE DISPARATE TREATMENT CLAIM

█ Walker alleges that the defendant Fire Company violated his Fourteenth Amendment right to equal protection by rejecting his application for probationary membership on the basis of race. To establish a violation of the Equal Protection Clause, a plaintiff must prove that the challenged action was taken with a racially discriminatory intent or purpose. *Wash-*

ington v. Davis, 426 U.S. 229, 239–45, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In *Arlington Heights, supra,* the Court held that a plaintiff need not "prove that the challenged action rested solely on racially discriminatory purposes." *Id.* at 265, 97 S.Ct. at 563. It is sufficient to show that a discriminatory purpose was "a motivating factor in the decision." *Id.* at 265–66, 97 S.Ct. at 563. Furthermore, because direct or express evidence of racially discriminatory intent is seldom available, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Washington v. Davis, supra,* 426 U.S. at 242, 96 S.Ct. at 2048. The challenged action in Walker's disparate treatment claim is the March 4, 1974, decision of the Company to reject his application for probationary membership. Hence, the Court must decide whether it is reasonable to infer from all the evidence that the rejection of Walker's application was based in whole or in part upon race.[19]

█ The gravamen of Walker's complaint is that he was treated differently from other applicants because he was black. In the employment context, a plaintiff alleging disparate treatment may satisfy his initial burden of establishing a prima facie case of racial discrimination by showing

(i) that he belongs to a racial minority; (ii) *that he applied and was qualified* for a job for which the employer was seeking job applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

18. In February 1974 a rumor was circulating in the Fire Company that Walker would cause trouble if he were admitted. (Hamilton, A–96). Captain Klonowski of the Dover City Police Department apparently initiated the rumor. When contacted by Kline Kemp, the Fire Chief, Klonowski said he had only secondhand information and could not provide any details.

Consequently, Kemp did not pursue the matter further. (Kemp, B–30, 31).

19. In a disparate treatment case the standard is the same whether the action arises under Title VII, 42 U.S.C. § 1981, or 42 U.S.C. § 1983. *Scott v. University of Delaware,* 455 F.Supp. 1102, 1120 (D.Del.1978), *citing McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273 (1976).

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (emphasis supplied). If the plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* The fact that an apparently legitimate reason for the rejection has been supplied does not necessarily end the inquiry. The plaintiff must be afforded a fair opportunity to show the stated reason was in fact a pretext or that the criterion was applied in a discriminatory fashion. *Id.* at 804–07, 93 S.Ct. at 1825–1826; *see McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Although several factors distinguish a volunteer fire company from the typical employer, the rules relating to the burden of proof stated above provide a useful starting point for the analysis of Walker's disparate treatment claim.

In this case, a dispute exists over whether Walker was qualified to be a member of the Company—specifically, whether he met the respectable citizen criterion. From a purely objective standpoint, the Court finds that the Company legitimately could have concluded from the information contained in the Investigating Committee report that Walker did not satisfy the criterion. It is also true, however, that the respectable citizen criterion is highly subjective, and Walker has presented evidence that arguably supports his contention that the standard was applied more strictly to him than to white applicants. In addition, Walker contends that his application was handled differently by the Investigating Committee because of his race. Given the way the issues are framed, the Court does not find it useful to attempt to decide whether Walker met his burden of establishing a prima facie case. In either event, he would still bear the burden of persuasion. To prevail on his disparate treatment claim, Walker must show either that the reasons given in the March 13, 1974, letter were in fact a pretext for racial discrimination, or that the "respectable citizen" criterion was applied in a discriminatory fashion against him. That is, he must prove discriminatory intent.

Determining whether a racially discriminatory purpose was a motivating factor or but for cause of Walker's rejection "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights, supra*, 429 U.S. at 266, 97 S.Ct. at 564. The plaintiff presented evidence concerning several factors which he argues give rise to an inference of discriminatory purpose. Those factors and the weight they deserve are discussed below.

### A. The Absence of Blacks in the Fire Company

No black has ever been a life member of the Robbins Hose Fire Company. In February 1974 there were a total of 166 life members of the Fire Company. According to the 1970 census, blacks make up 19.2 percent of the population of males over 21 years of age in the City of Dover. (Siskin, B–141). The plaintiff's expert, Dr. Siskin, stated that the probability of drawing an all white work force of 166 people from the Dover population is infinitesimally small. (Siskin, B–141). Part of the disparity, however, can be attributed to the fact that the Company excluded blacks from membership up until 1960. Between the years 1962 and 1972 inclusive, 35 new members joined the Fire Company. (Siskin, B–144). None of the new members were black. Dr. Siskin testified that the probability of having no blacks in a group of 35 persons drawn from the Dover population by a process of random selection without regard to race is .0006—a small probability. (Siskin, B–144). The Court accepts this testimony as true.

When confronted with the additional fact that no black had applied between 1960 and 1974, Dr. Siskin testified that

obviously the process which is related to race is in the recruitment process, the process of blacks applying to the [Fire Company]. (Siskin, B–143).

This conclusion finds support in the fact that no similar disparity exists between the percentage of blacks who actually applied

for membership and were rejected and the percentage of whites who applied for membership and were rejected. The evidence shows that five blacks have applied for probationary membership since 1974 and that four of those five were accepted. The record also indicates that the Company has denied probationary membership to whites who did not satisfy the membership criteria. Dudley Dixon, a white person, was investigated by Mitchell in 1974 and was denied probationary membership because he received an unfavorable recommendation from the Marydel Fire Company. (Mitchell, A–144, 145, 146). The Marydel Chief told Mitchell that Dixon drove recklessly to fires and became excited easily. (Mitchell, A–146; DX 6). Thus, while the record arguably supports an inference of discrimination in the recruitment process, it contains no statistical evidence of discrimination in the application review process.

Walker argues that the substantial underrepresentation of blacks on the Fire Company provides a rational basis for concluding that racial factors tainted the decision to reject him. This Court recognizes that " '[s]tatistical analyses . . . serve an important role' in cases in which the existence of discrimination is a disputed issue." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). Nevertheless,

> statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all the surrounding facts and circumstances.

*Id.* at 340, 97 S.Ct. at 1856–1857. The ultimate question whether Walker's rejection was based on his race must be answered in light of all the evidence, both statistical and nonstatistical. *Scott v. University of Dela-*

*ware, supra,* 455 F.Supp. at 1127; *EEOC v. DuPont,* 445 F.Supp. 223 (D.Del.1978).

The fact that the Fire Company is all white warrants close scrutiny of its contention that Walker was not qualified for probationary membership. *See Kinsey v. First Regional Securities, Inc.,* 181 U.S.App.D.C. 207, 216, 557 F.2d 830, 839 (1977). The statistical evidence alone, however, provides little support for an inference that Walker's rejection was in fact based on his race. "Statistics concerning the defendant's treatment of the plaintiff's class in general are relevant, but do not alone prove discrimination against an individual plaintiff even when such statistics show substantial disparities." [20] The statistics here suggest the possibility of discrimination only in the recruitment process. The Court is reluctant to infer from such evidence that a racially discriminatory animus pervaded the entire membership process and thus affected Walker. The Fire Company has always taken a passive role with respect to recruiting: it has never recruited. The Company's adherence to that policy after it changed the by-laws in 1960 to permit blacks to apply, however, may have contributed to the absence of black applicants.[21] The Company's failure to publicize the fact that persons of all races were welcome to join the Fire Company arguably reflects an insensitivity on the part of its members to the situation of blacks in Dover, but it hardly suggests that they would actively try to exclude someone on the basis of race.

Furthermore, Walker's statistical evidence is based upon the assumption that both blacks and whites would want to join the Fire Company with an equal desire. (Siskin, B–147). Such an assumption would be reasonable in a job advancement or employment case, but its validity here is at

---

**20.** B. Schlei & P. Grossman, *Employment Discrimination Law* 1154 & n. 20 (1976). *See* Note, *Beyond the Prima Facie Case In Employment Discrimination Law: Statistical Proof And Rebuttal,* 89 Harv.L.Rev. 387, 417 n. 142 (1975).

**21.** Whether the Company's recruitment policy itself violates Walker's equal protection rights is discussed in Part III. A, *infra.*

least questionable. In employment cases the economic attraction is obvious. In the volunteer fire company context, however, the two principal inducements to agreeing to fulfill the rather onerous and sometimes dangerous obligations appear to be: (1) the personal pride that derives from performing an important public service and (2) the intangible benefits of belonging to what, in effect, amounts to a social club. The Court, of course, would be willing to assume that there is no distinction between blacks and whites with respect to their sense of civic duty and pride. On the other hand, a person may serve his community in many ways, and a black person might not consider the Fire Company to be an attractive environment for fulfilling his civic obligations. This distinction between volunteer fire companies and typical employers further undermines the importance of the plaintiff's statistical evidence.

### B. History of Discrimination

The Courts have identified several kinds of evidence which can be used to establish discriminatory purpose, including "the historical background of the decision . . ," particularly if it [shows] a series of invidiously motivated official actions." *Arlington Heights, supra,* 429 U.S. at 267, 97 S.Ct. at 564; *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 141 (C.A.3, 1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 499 (1978). Walker cites two historical facts which he contends support a finding that a racially discriminatory animus motivated the Company's rejection of his application. The Court concludes that neither fact appreciably strengthens Walker's disparate treatment claim.

First, the plaintiff refers to the Company's overt exclusion of blacks prior to 1960. Although this fact could contribute to establishing a prima facie case, it is not very helpful in overcoming the evidence of legitimate grounds for rejection introduced by the Fire Company. The Company's past history of discrimination, like the statistical evidence, prompts the Court to scrutinize closely the reasons given for the rejection. On the issue of discriminatory intent, how-

ever, the evidence is no more probative than the statistical evidence.

Second, Walker refers to the fact that during 1973 Wilbert Cooper, President of the local chapter of the NAACP, complained to the Office of Revenue Sharing that the Company, which was to receive $600,000 in federal funds for use in its building program, discriminated on the basis of race. An investigation ensued and the Company was asked to amend certain portions of its constitution and by-laws. (Pusey, A–178). The Company agreed to make the suggested amendments and started preparing the same; the amendments were adopted on April 1, 1974. (Pusey, A–178; DX 8). By the time Walker applied, federal funding for the building project had been restored. (Pusey, A–179).

Walker argues that this incident somehow strengthens the inference that the Company purposely sought to exclude blacks. The Court disagrees. The Fire Company needed the federal money to complete its building program and the members knew that federal funding would be withheld if they were found to have discriminated on the basis of race. (Pusey, A–178, 179). If anything, the pendency of the federal revenue sharing funds would tend to weaken the inference that Walker's rejection was based on his race.

### C. Departures From Normal Procedures

Some of the other subjects of relevant inquiry in determining whether racially discriminatory intent existed are the "specific sequence of events leading to the challenged decision," including any procedural or substantive departures from the normal practice, and the administrative history of the decision "especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights, supra,* 429 U.S. at 267–68, 97 S.Ct. at 565. Walker alleges that the manner in which his application was handled differed in sev-

eral respects from the manner in which most other applications were handled. For example, Walker contends that the unusual makeup of the Committee that investigated his application evidences a discriminatory purpose. The record shows that Company Vice President Hamilton attended both of the Walker interviews and President Pusey attended the second interview. Neither gentleman participated in any other applicant interviews during his tenure as an officer of the Company. (Mitchell, A–153). While this departure from normal procedures may appear suspicious standing alone, the Court finds that the explanation offered by the defendant is sufficient to dispel any inference of discriminatory purpose that could be drawn from it. Only one of the three members of the Investigating Committee, namely, Mitchell, was active at the time Walker applied. Pusey, an ex officio member of the Committee, testified that he asked Hamilton to attend the first interview because of the widespread publicity attendant to Walker's application and the recent investigation of the Fire Company by the Office of Revenue Sharing. The Court accepts this testimony as true. It is understandable that Pusey would not want to burden Mitchell with the sole responsibility for carrying out such a sensitive investigation.[22] Furthermore, the Court perceives no prejudice to Walker as a result of the participation of Hamilton and Pusey on the Investigating Committee. Hamilton spoke out against Walker at the general membership meeting, but he had been contacted by members of the general public with reference to Walker's application. There is no indication that Hamilton would have remained quiet, if he had not attended the Investigating Committee meetings.

Walker also points out that his is the only case in which the Investigating Committee examined an applicant's prior housing record. (Mitchell, A–99, 100). Similarly, he complains that his case appears to be the only one in which the Committee checked prior employers. In light of all the evidence, however, the Court finds nothing improper about the broad scope of the Walker investigation. Mrs. Tazelaar of the Housing Authority learned of his application to the Fire Company through the newspaper and took it upon herself to apprise the Company of her dealings with him. The Investigating Committee properly took note of her complaint. Each of the Investigating Committee's contacts with Walker's prior employers can be traced directly to information brought to the Committee's attention by persons not on the Committee.[23] The Court finds that the publicity surrounding Walker's application accounted for the unprecedented amount of public comment and that the Investigating Committee merely fulfilled its duty to make a diligent inquiry into the applicant's character and standing in society when it followed up on the information provided. No inference of discriminatory intent is warranted.

Walker also contends that the report of the Investigating Committee contains several errors and exaggerations which operated to his prejudice. The report states that Walker was discharged from Stevenson House in part because he falsified an application. Mitchell admitted that that statement is completely erroneous. (Mitchell, A–138). Aside from that the Court finds the Investigating Committee's report to be substantially accurate. Walker complains

22. The record also reflects that Mitchell asked Chief Kemp if he wanted to sit in on the first interview. Kemp declined and told Mitchell that he should handle Walker's application the same way that he would any other case. (Kemp, B–18).

23. McCabe told Hamilton about Walker's employment at the State Custodial Department; an unidentified person told Hamilton that Walker had worked at the National Cup Company; Robert Konshack informed Mitchell that

he had heard Walker had been dismissed from the security force at Dover Downs; Mitchell's father told him about Walker's job with ILC Industries. The record reflects that the Investigating Committee learned about the Stevenson House incident either through Mrs. Truitt, who was an employee there, or her husband, and Mrs. Tazelaar's letter to the Committee indicated that Walker had worked at Leeds Travelwear. (DX 25). Information as to the other employers was supplied by Walker himself.

that the statements indicating that: (1) he was terminated from the Dover Downs security force; (2) he was discharged from the State Custodial Service for walking off the job; and (3) he was a "troublemaker" at ILC Industries are inaccurate and based totally on hearsay information. It is true that Mitchell relied on hearsay in preparing the Investigating Committee's report, but based on the evidence presented at trial,[24] the Court finds all three of the challenged statements to be accurate. Lastly, Walker questioned the Committee's failure to contact the National Cup Company and to mention that an appeal was pending to the EEOC regarding the Stevenson House matter. The two omissions are too minor to provide any support for an inference of discriminatory intent.

In the same vein, Walker contends that the Investigating Committee report made his criminal record seem worse than it actually was.[25] The Court disagrees. The Investigating Committee routinely checked the police record of each applicant. (Mitchell, A–98). Walker's criminal record was incorporated without comment in the Investigating Committee's report. (PX 14). Mitchell testified that he included the criminal record as a matter of course, just as he had with respect to the other twenty-three applicants he investigated. (Mitchell, A–120, 121, 134, 135). Furthermore, the Court perceives no harm to Walker from the Committee's failure to mention that he was pardoned for the 1954 assault and battery conviction. The criminal record already indicated that there was no disposition of the charge. (PX 14).

Finally, Walker complains that no one on the Investigating Committee or in the Company looked for reasons to support his application. For example, he was never asked about his activities in his church. He is a churchgoer and sings regularly in the choir. (Walker, B–87, 88). He also states that he should have had an opportunity to have his friends speak in his favor at the membership meeting, because white applicants often know members and thus have someone to speak in their behalf. None of these alleged shortcomings warrant an inference that a racially discriminatory purpose motivated Walker's rejection. Nothing prevented Walker from bringing favorable references to the attention of the Committee or telling them about his church and choir activities. The Committee took the unusual step of interviewing Walker a second time to give him a chance to explain the questionable aspects of his record. (Mitchell, A–153, 155). Walker again was less than

---

24. Walker objected to the use for any purpose other than credibility of any evidence about his employment or other background that was not known to the members of the Company at the time of the challenged action. Clearly, information unknown to the members at the time of their vote cannot be used to justify the March 4, 1974, rejection of Walker's application. However, some of the evidence objected to is relevant to determining the accuracy of the hearsay information the Investigating Committee relied upon in preparing its report. To that extent, the Court did consider such evidence. For example, the statement that Walker had been terminated from the Dover Downs security force was based on hearsay from Officer Konshack. Walker testified that he either resigned or was laid off due to lack of work. The Court credited the Investigating Committee's version based on the testimony of Walker's employer at Dover Downs, James D. Horn (see Horn, C–28), despite the fact that Horn had not been contacted in 1974. The Court also found Horn to be a more credible witness than Walker.

25. Walker also seems to argue that, contrary to its normal procedures, the Investigating Committee requested a copy of his FBI record. The record contains Investigating Committee reports on several applicants, but only the reports on Walker and Robert J. Patterson, a white, contain FBI reports. (PX 14; DX 3). The Court notes, however, that nothing in the record indicates whether the Investigating Committee requested the FBI report on Walker or whether it was the State or the FBI that supplied it. The FBI records of both Walker and Patterson bear the same handwritten filing identification number as their State Bureau of Identification records. (PX 14; DX 3). Neither Mitchell nor Hamilton were asked about the FBI report, and Mitchell testified that there was nothing unusual about the investigation of Walker besides the significant amount of public interest that it generated. (Mitchell, A–134, 135). On such a sparse record, the Court will not speculate about how the Investigating Committee obtained the FBI report.

forthright with the Committee. (PX 14). Moreover, the Company supplied Walker with a detailed list of the reasons for his rejection. He could have gone to the Investigating Committee and challenged or contraverted those reasons and requested reconsideration or he could have reapplied after a waiting period of six months.

### D. *Unequal Application of the "Respectable Citizen" Criterion*

The last category of evidence Walker relies upon to support his disparate treatment claim pertains to white applicants who were accepted as probationary members despite past indiscretions reported by the Investigating Committee. Walker named six white members whom he argues had records comparable to his. Citing *McDonald v. Sante Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), he contends that this evidence shows that the Fire Company applied the respectable citizen criterion more strictly in his case because of his race. To facilitate the comparison the plaintiff invites, the Court will set forth the pertinent facts concerning each of the white applicants named.

The application of William R. Keith was read at the general membership meeting on April 1, 1974, and turned over to the Investigating Committee. Three years earlier, Keith had been expelled from the Minquas Fire Company for following too closely and passing an ambulance. (PX 4, pp. 7, 11–14). Keith had been a member of the Minquas Fire Company for almost five years before he was expelled. (PX 4, p. 14). Mitchell investigated Keith's application and testified that the people he contacted on the Minquas Fire Company told him that Keith was a good fireman. (Mitchell, A–127). Mitchell also stated that during his interview Keith forthrightly discussed the incident for which he was expelled. (Mitchell, A–127). Keith had no criminal record and only one minor traffic violation. (PX 4, p. 13). The Investigating Committee issued a

favorable report on Keith and he was accepted as a probationary member on May 6, 1974. (PX 4, p. 10).[26]

James Melvin, Jr., applied for probationary membership in 1968. The Investigating Committee gave Melvin a favorable recommendation with one member dissenting. (PX 4, p. 2). The letter submitted by the dissent indicates that Melvin had been involved in two questionable incidents in the past. In October 1965 Melvin admitted to the police that he had broken into a local business establishment, but stated that he only intended to use the telephone because his car had broken down late that evening. The owner of the business did not wish to prosecute Melvin because he was a former employee. (PX 4, p. 5). Melvin also was under a one-year suspension from the Little Creek Fire Company at the time he applied for probationary membership. He was suspended because he had been present when another member of the Little Creek Fire Company reported a false fire alarm and had responded with the Company even though he knew the alarm to be false. (PX 4, p. 5). The first time Melvin's application came up for consideration Kline Kemp moved successfully to have it tabled. (PX 4, p. 1). At trial, Kemp testified that he had personal knowledge of the alleged burglary and knew that it had been a mistake and that no charges had been filed against Melvin. (Kemp, B–24, 25). Kemp characterized Melvin's involvement in the false fire alarm as being passive only and the act of a juvenile. (Kemp, B–25). When Melvin's application was considered again at the next meeting, three members questioned his qualifications, but he gained probationary membership by the narrow margin of 14 to 10. (PX 4, p. 2).

The Investigating Committee reported unfavorably on the application of Daniel Lee at the Company's January 7, 1974 meeting. (PX 4, p. 17). Lee had been arrested in Indiana for vagrancy in 1963

---

**26.** The Fire Company processed Keith's application under the new procedure adopted on April 1, 1974. The procedure required the Investigating Committee to make a recommendation and provided that the recommendation be adopted automatically unless someone objected. In Keith's case no one objected. (PX 4, p. 10).

and in Delaware for failure to stop at the command of a police officer, disregarding a red light, stopping past a stop line limit at a red light and disregarding a stop sign, all on May 6, 1965, and for disregarding a red light on June 9, 1971. (PX 4, p. 25). A motion was made to reject Lee's application, but after much discussion the application was tabled for further investigation. (PX 4, pp. 17–18). At the following meeting Lee was accepted as a probationary member after his employer, who was also a member of the Fire Company, spoke on his behalf. (Hamilton, A–70; PX 4, p. 21). Hamilton testified that the membership had been told that Lee came from a very poor family background and that he was arrested for vagrancy after he had run away from home to avoid beatings by his father. (Hamilton, A–71).

Larry Moore applied for probationary membership in December 1973, when he reached his 21st birthday. (PX 4, p. 30). He had been an auxiliary member of the Company since 1968 but his record in that capacity was unimpressive. In 1968 Moore had been suspended for 30 days for skipping school. Two years later he was ejected from the Company for unknown reasons and then, after being readmitted, was ejected again, this time for being AWOL from his National Guard drill. (PX 4, p. 33). Moore had been AWOL because he had been involved in an automobile accident while returning to camp; the AWOL charges eventually were dropped. (Hamilton, A–71). The accident referred to occurred because Moore fell asleep at the wheel and he was charged with reckless driving as a result of it. (Hamilton, A–71; PX 4, p. 31). Moore also had his driver's license suspended for two months for accumulated points in August of 1972 and received warnings for speeding on November 13, 1972, and February 5, 1973. (PX 4, p. 31). He had no other criminal record. On the positive side, the Investigating Committee report indicated that during the months immediately preceding his application, Moore had a perfect attendance record at Company drills. The report also stated that Moore had attended numerous fire schools

and in-service schools. (PX 4, p. 33). In addition, Mitchell testified that each of the past chiefs who had supervised Moore as an auxiliary member recommended that he be accepted. (Mitchell, A–130).

Norris Garrison was accepted as a probationary member on July 5, 1971, by a unanimous vote. (PX 4, p. 38). Garrison had been a member of the Little Creek Fire Company since 1966. He had been suspended for one year during that time for being involved in the reporting of a false fire alarm. No legal action had been taken against him. (PX 4, p. 41). The Investigating Committee reported that Garrison had successfully completed several Delaware State Fire School sessions and had served on the board of directors of the Little Creek Fire Department. Garrison had no criminal record and no motor vehicle violations are listed in the Investigating Committee's report on him. (PX 4, p. 41).

Finally, the parties filed a stipulation of evidence (Docket Item 96) after the trial in this action, setting forth newly discovered evidence that Hughlett A. Golt, a long-time member of the Company, had pled guilty to embezzling $95,000 from the Farmers Bank of the State of Delaware in 1947 and served three years in jail at Lewisburg Prison as a result. Golt joined the Company in 1925. At the time he was convicted, Golt had been treasurer for the Company for at least 20 years. The Company immediately had its books audited to determine whether Golt had embezzled any money from it and found that he had not. (Docket Item 96, ¶ 4). No disciplinary action was ever taken against Golt, who remained a life member of the Company until he died in December 1978. Golt was President of the Company in 1978 and President-elect for 1979 when he died. (Docket Item 96, ¶ 7). The parties further stipulated that the members of the Company responsible for answering the interrogatories submitted by the plaintiff in this case knew nothing about Golt's conviction. (Docket Item 96, ¶ 8).

Walker argues that his record is no worse than the records of each of the white applicants mentioned above and that the fact

that those applicants were accepted as probationary members gives rise to an inference that the grounds for his rejection were merely a pretext for racial discrimination. The Court first must determine whether the records of the white applicants are comparable to Walker's record. The Court finds that Keith and Garrison clearly had better records than Walker. Keith had committed only one offense, he had substantial fire experience, he had received an otherwise good report from his former fire company, and he had been cooperative and forthright with the Investigating Committee of the Robbins Hose Fire Company. Likewise, Garrison had only one strike against him—the fact that he had been involved in the reporting of a false fire alarm. Because it appears from the record that Garrison was at most 23 years of age when he committed that indiscretion, the Court finds the characterization of it as "a juvenile act" to be reasonable. (Hamilton, A–73; PX 4, p. 40). Walker, on the other hand, had committed several questionable acts, had little or no fire experience, and had been uncooperative and evasive in his dealings with the Investigating Committee.

The Court considers the evidence regarding Golt's conviction for embezzlement immaterial. At the time he pled guilty to the offense, Golt was a life member of the Fire Company. Therefore, the failure of the Company to discipline Golt sheds very little light on the meaning of the respectable citizen criterion for acceptance of probationary members. More importantly, it appears that few, if any, of the members who voted on Walker's application knew about Golt's conviction. Consequently, the Court finds no basis for inferring from the handling of Golt's case that the rejection of Walker's application was motivated by considerations of race.

The improper conduct of the three other white applicants mentioned cannot be distinguished so easily. Initially, the Court notes that, while the records of the three whites were somewhat less than desirable, they were no worse than Walker's record. Melvin's involvement in the breaking and entering incident is certainly no more questionable than Walker's conduct in writing a personal letter to a female detainee at Stevenson House. The other misconduct charged to Melvin, viz., going along with what he knew was a false fire alarm, is more than offset by Walker's poor performance on several jobs, his falsification of applications to the Dover Housing Authority, and his less than perfect driving record. Similarly, Lee's arrests in 1963 for vagrancy and in 1965 for disregarding a police officer's order to stop compare favorably with Walker's criminal record and his improper conduct at Stevenson House. The only other complaint about Lee concerned his poor motor vehicle record. He had been charged with numerous offenses stemming from an incident that occurred eight years before he applied, when he was 20 years old, and with disregarding a red light in 1971. Lee's driving record was not much worse than Walker's, however, and the difference between them cannot be said to outweigh the doubts raised by Walker's poor employment record and his lack of candor in his dealings with Mrs. Tazelaar and the Investigating Committee. Lastly, with respect to Larry Moore the Court finds that several of the negative items in his report relate to an accident caused by his falling asleep at the wheel while enroute to a National Guard drill. It is also noteworthy that Moore was only 21 years of age when he applied and was known to many members of the Company because he had served for some time as an auxiliary member.

On the other hand, the acceptance of these three white applicants arguably does provide some support for inferring that a discriminatory purpose motivated Walker's rejection. In light of the other evidence in this case, however, the Court finds the degree of that support to be minimal. In the case of each of the three white applicants, one or more members of the Company knew the applicant personally and spoke in favor of his application. No one knew Walker well enough to speak in his behalf. While this distinction might be traced to the all-white makeup of the Fire Company, it does not evidence intentional discrimination.

Walker could have submitted references to the Committee and he was afforded a second interview to explain the questionable conduct discovered by the Investigating Committee. The facts that Lee received an unfavorable recommendation from the Investigating Committee and Melvin received the support of only two of the three members who investigated him and gained membership by only four votes also undermine the argument that Walker's application was evaluated under a significantly different standard.

### E. Summary

■ Based on all the evidence, the Court concludes that Walker's application for probationary membership was not rejected on the basis of race. Rather, the Fire Company refused to accept him as a member because his record indicated that he was neither dependable nor trustworthy and therefore did not satisfy the requirement that he be a "respectable citizen." The investigation of Walker revealed that he had been discharged for cause from Stevenson House, that he had been discharged for walking off the job by ILC Industries and the State Custodial Department, that his employment with the security force at Dover Downs had been terminated, that he had not volunteered any information relative to any of these employers during either of his two interviews with the Investigating Committee, that he had a police record, that he had falsified applications to the Dover Housing Authority, and that his prior fire experience had been with an uncertified fire company that had no recognized standard of training during the time of his involvement. The letter from Boyer to Walker, dated March 13, 1974, states that these findings constituted the basis for Walker's rejection. While there are a few minor errors and exaggerations in the Investigating Committee's report and the letter stating the reasons for Walker's rejection, the Court finds that these misstatements were unintentional and that they do not reflect a racially discriminatory purpose.

The Court finds that Walker's criminal record standing alone would not have provided an adequate basis for excluding him from membership. However, the Court also finds that Walker's criminal record was merely one factor among several that contributed to his rejection. The evidence shows that it is highly improbable that a majority of the members of the Company who voted to reject Walker considered his criminal record a determinative factor. In keeping with its normal procedures, the Investigating Committee merely reported Walker's criminal record and did not enlarge upon it in any way. Finally, three of the four members of the Fire Company who testified as to their reasons for voting against Walker based their decision on the Investigating Committee report as a whole and did not emphasize the criminal record.

For the reasons stated above, the Court concludes that considerations of race were not a but for cause of Walker's rejection. Accordingly, the Court finds for the defendants on the plaintiff's disparate treatment claim.

### III. THE DISPARATE IMPACT CLAIM

Walker also claims that the Fire Company's membership process, as a whole, has had, and continues to have, a discriminatory impact on blacks. Specifically, the plaintiff contends that the following practices, separately and cumulatively, operate to exclude blacks: the recruitment process, the broad discretion afforded the Investigating Committee, the subjective membership criteria, the practice of voting on applicants, and the use of arrest records in evaluating applicants.

■ Although the Court has concluded that the rejection of Walker's application for probationary membership on March 4, 1974, was not racially motivated, Walker still may challenge the membership procedures in general based on a disparate impact theory of discrimination. This Court has recognized that individual plaintiffs can pursue disparate impact claims.[27] Walker is

27. *Stallings v. Container Corp. of America*, 75 F.R.D. 511, 515 (D.Del.1977); *see Coopersmith* *v. Roudebush*, 170 U.S.App.D.C. 374, 517 F.2d 818 (1975).

a member of the group allegedly adversely affected by the membership process, and he has the option of reapplying for probationary membership in the future.[28]  That he remains interested in becoming a member of the Company is clear from his request for an order instating him to membership. Thus, the Court concludes that Walker has standing to challenge the membership process on the ground that it has a disparate impact on blacks.

The relief Walker seeks is class-wide.[29] Besides a judgment declaring that the Company's membership practices violate the Civil Rights Act of 1866 and 1871, 42 U.S.C. §§ 1981 and 1983, he requests an order requiring the Fire Company: (1) to encourage blacks to apply for membership and to publicize in the black community the fact that the Fire Company welcomes black volunteers; (2) to amend the by-laws to define specifically the requirements for membership and to assure that all such requirements are job-related; and (3) to amend the by-laws to provide specific written guidelines to govern the Investigating Committee in conducting background investigations of applicants.  To make out a claim under § 1983, Walker must show that the recruiting and membership procedures burden

blacks more than whites and that those procedures were instituted or maintained for a discriminatory purpose.  *Washington v. Davis, supra,* 426 U.S. at 238–48, 96 S.Ct. 2040; *Arlington Heights, supra,* 429 U.S. at 265, 97 S.Ct. 555.  The plaintiff attempts to avoid the discriminatory intent requirement by pressing his disparate impact claim under 42 U.S.C. § 1981, instead of § 1983. The Supreme Court has not yet decided whether § 1981 should be treated like Title VII under which proof of discriminatory intent is unnecessary or like § 1983.[30]  The question remains open in the Third Circuit also.  *See Richardson v. Pennsylvania Department of Health,* 561 F.2d 489, 493 (C.A.3, 1977).  A few courts have held that a showing of disparate impact will suffice without more to establish a prima facie case of employment discrimination under § 1981 just as it does under Title VII.[31]  Several other courts have held that § 1981, like § 1983, requires proof of a racially discriminatory purpose.[32]  This Court finds the latter cases more persuasive, especially in a non-employment case like this one, but the facts here make it unnecessary to decide the issue.

In analyzing Walker's disparate impact claim, the rules developed in Title VII cases

**28.** The Company's constitution permits a disappointed applicant to reapply any time after six months from the date of his rejection.  (DX 8, Art. VI, Sec. 1).

**29.** In an earlier opinion decertifying the class action aspects in this case, the Court noted that the plaintiff could obtain the classwide benefits he requested in his complaint even if he proceeded in an individual, as opposed to a representative, capacity.  76 F.R.D. 218, 223 (D.Del. 1977).

**30.** The Supreme Court recently heard argument in a case that presents this issue.  *Davis v. County of Los Angeles,* 566 F.2d 1334 (C.A.9, 1977), *cert. granted,* 437 U.S. 903, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (1978), *argument heard* —— U.S. ——, 99 S.Ct. 346, 58 L.Ed.2d 342 (1978).

**31.** *See Davis v. County of Los Angeles, supra,* 566 F.2d at 1340; *Kinsey v. First Regional Securities, Inc.,* 181 U.S.App.D.C. 207, 215 n. 22, 557 F.2d 830, 838 n. 22 (1977) (dictum); *Winston v. Smithsonian Science Information*

*Exchange,* 437 F.Supp. 456, 473 (D.D.C.1977); *cf. Johnson v. Ryder Truck Line, Inc.,* 575 F.2d 471, 474–75 (C.A.4, 1978) (seniority system lawful under Title VII may not be invalidated under § 1981).

**32.** *See City of Milwaukee v. Saxbe,* 546 F.2d 693, 705 (C.A.7, 1976); *Croker v. Boeing Co. (Vertol Division),* 437 F.Supp. 1138, 1181 (E.D. Pa.1977); *Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission,* 431 F.Supp. 526, 533–34 (S.D.N.Y.), *vacated without opinion,* 562 F.2d 38 (C.A.2, 1977); *Arnold v. Ballard,* 448 F.Supp. 1025, 1027–28 (N.D.Ohio 1978); *Lewis v. Bethlehem Steel Corp.,* 440 F.Supp. 949, 962–66 (D.Md.1977); *Johnson v. Hoffman,* 424 F.Supp. 490, 494 (E.D.Mo.1977).  For a thorough and informative discussion of this issue, see Note, *Racially Disproportionate Impact of Facially Neutral Practices—What Approach Under 42 U.S.C. Sections 1981 And 1982?,* 1977 Duke L.J. 1267.

provide a useful starting point. The Supreme Court recently described the controlling principles and trial burdens in Title VII disparate impact cases as follows:

> [T]o establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern. Once it is thus shown that the employment standards are discriminatory in effect, the employer must meet "the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question." *Griggs v. Duke Power Co., supra*, 401 U.S. [424] at 432, [91 S.Ct. 849, 28 L.Ed.2d 158.] If the employer proves that the challenged requirements are job related, the plaintiff may then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'" *Albemarle Paper Co. v. Moody, supra*, 422 U.S. [405] at 425, [95 S.Ct. 2362, 45 L.Ed.2d 280] quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, [93 S.Ct. 1817, 36 L.Ed.2d 668.]

*Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–2727, 53 L.Ed.2d 786 (1977). With those principles in mind, the Court turns to the merits of Walker's disparate impact claim.

### A. *The Recruitment Procedure*

The evidence shows that the Fire Company has never recruited actively for new members. Since its founding in 1882, the Company has relied completely upon walk-in volunteers. The by-laws, however, expressly excluded blacks from membership until the membership criteria were amended in June of 1960. Thereafter, no black applied for membership until February 1974, although blacks made up approximately 19 percent of the male population over 21 years of age in the City of Dover during that period. More than 35 whites joined the Company between the years 1960 and 1974; by the end of that period, there were 116 life members residing in the Dover area and all of them were white. In 1974 four blacks including Walker picked up and returned applications. (DX 1). Only two other blacks had submitted applications by the time this case proceeded to trial on June 19, 1977. (Mitchell, A–147; Boyer, A–205). One of the latter two applications was withdrawn before any action could be taken on it. (Boyer, A–206). The record further indicates that no blacks have ever attained life membership status in the Company, and that, at the time of trial, there were no black members of any kind in the Company.

Based on the substantial imbalance between the percentage of blacks in the relevant portion of the general population of Dover and the percentage of blacks in the Fire Company, the plaintiff's expert, Dr. Siskin, concluded that "race in some fashion is related to the [membership] process." (Siskin, B–142). The additional fact that between 1960 and 1974 no blacks, but more than 35 whites, applied for membership caused Dr. Siskin to conclude further that "the process which is related to race is in the recruitment process . . . ." (Siskin, B–142). In the following colloquy taken from the trial transcript, Dr. Siskin suggested a few possible reasons why blacks and whites might not exhibit an equal desire to join a volunteer fire company like the Robbins Hose Fire Company:

> A Well, you could list the possibilities of why this could occur. One could be the method of recruitment of the Fire Company. It often would be through friends, relatives, and so forth. If it is an all-white force, this is going to tend to disproportionately attract whites. It could be reputation of an agency. I[t] [sic] could be to a certain extent that blacks, for some reason, would be less likely to want to be volunteer firemen than whites would want to be volunteer firemen. I know that is not necessarily the case in the Philadelphia fire department. It is not case for paid fire jobs.
>
> THE COURT: You see a difference between a paid fire job and volunteer fire jobs, don't you?

THE WITNESS: Yes.

BY MR. GRADY:

Q Is there anything that you know of in any studies that you have done which would indicate that blacks would be less anxious to take on a volunteer job than whites?

A Well, from what I've seen in various studies for various human rights agencies and so forth, the volunteer fire man is often a situation of the methods of recruitment, friends, relatives, social functions, which would tend to have a very restrictive racial effect, which is common in most types of volunteer organizations of that sort. (Siskin, B–147 to 149).

The method of recruitment used by the Fire Company generally fits the norm described by Dr. Siskin. Even though the Company does not actively recruit, most of its new members are friends or relatives of present members[33] or persons who have heard about the Company through present members or their friends. (Mitchell, A–119). Company members do not solicit anybody to volunteer, but information about the Company circulates among the public by word of mouth. Dr. Siskin's observations about the effect of such a recruitment policy find support in the employment context, where "[n]umerous courts have found that word-of-mouth recruitment by a substantially all-white work force has the effect of replicating the racial characteristics of the existing work force."[34]

The challenged action here is in fact an omission: the failure of the Fire Company to engage in active recruiting at any time since it amended its by-laws in 1960 to remove the phrase that explicitly precluded blacks from becoming members. To establish a prima facie case of discrimination, Walker must show that this facially neutral decision to continue the Company's historical practice of not recruiting had the effect of producing an applicant pool with a racial makeup substantially different from that of the relevant portion of the general population. Proceeding under the assumption that the showing required to establish liability under § 1981 is the same as that required under § 1983, Walker must also prove a discriminatory intent on the part of the Fire Company officials. *Washington v. Davis, supra; Arlington Heights, supra,* 429 U.S. at 265–66, 97 S.Ct. 555. It is clear from the facts just recited that the plaintiff has met the first part of his burden. He has established that the Company's recruitment policy has had a disparate impact on blacks.

Before considering the intent question, the Court notes that the Company could have attempted to rebut Walker's prima facie case by showing either that something other than its recruitment procedure caused blacks to be underrepresented or that the Company's policy of not recruiting serves some important governmental purpose. *Cf. Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The former possibility is discussed *infra.* Concerning the latter, the Court notes that the only justification offered at trial was the fact that the Company had never recruited. In a case like this, where blacks were purposely excluded from the defendant organization throughout most of its history, adherence to past practice provides scant justification for continuing a policy that could foreseeably be expected to have the effect of perpetuating the existing racial makeup of the membership. Furthermore, there is no reason to expect that implementation of a limited recruiting program would unduly tax the resources of the Company or its members. The weakness of the rebuttal to Walker's challenge to the Company's recruitment procedure contrasts sharply with the convincing showing made by the Company in response to his disparate treatment claim.

---

**33.** As noted earlier, approximately twenty percent of the Company's present membership are related to other members.

**34.** B. Schlei & P. Grossman, *supra* at 446; *see, e. g., United States v. International Union of Elevator Constructors,* 538 F.2d 1012, 1016 (C.A.3, 1976); *Barnett v. W. T. Grant Co.,* 518 F.2d 543, 549 (C.A.4, 1975); *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421 (C.A.8, 1970); *Abron v. Black & Decker Mfg. Co.,* 439 F.Supp. 1095, 1108 (D.Md.1977).

In determining whether Walker has satisfied his initial burden with respect to the element of discriminatory intent, the Court must make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights, supra,* 429 U.S. at 266, 97 S.Ct. at 564. The record contains no direct evidence that the defendants intended to discriminate against blacks. Indeed, if a subjective intent to discriminate had to be proven to make out a claim under § 1981 and § 1983, the Court would be inclined on the record in this case to hold for the defendants without further discussion. The subjective intent of the decisionmaker is not necessarily dispositive, however. *See Richardson v. Pennsylvania Department of Health, supra,* 561 F.2d at 492. Rather, as Justice Stevens observed in a concurring opinion in *Washington v. Davis*:

> Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action . . . .

426 U.S. at 253, 96 S.Ct. at 2054.[35] Along the same lines, the majority in *Washington v. Davis* observed:

> Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.
>
> . . .

*Id.* at 242, 96 S.Ct. at 2048.

In this case, the Court concludes that Walker has established a prima facie case of purposeful discrimination with respect to the Company's practice of not recruiting.

This conclusion is based on several pieces of circumstantial evidence. First, the record indicates that the Fire Company's practice of not recruiting bears more heavily on blacks than whites. This showing supports an inference of discriminatory purpose. The Court does not consider it determinative, however, because the fact that a disproportionately small number of blacks have applied for membership in a volunteer fire company is not something that is clearly "unexplainable on grounds other than race." *See Arlington Heights, supra,* 429 U.S. at 266, 97 S.Ct. at 564. Second, the fact that prior to 1960 the Company overtly discriminated against blacks strengthens the inference that the decision not to recruit was motivated by a racially discriminatory purpose. *See Keyes v. School District No. 1,* 413 U.S. 189, 209–11, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Hazelwood School District v. United States,* 433 U.S. 299, 309 n. 15, 97 S.Ct. 2736, n. 15, 53 L.Ed.2d 768 (1977). Third, the Court finds the Company could have foreseen that its practice of not recruiting would tend to perpetuate its virtually all-white racial composition. Fourth, and lastly, the defendants have offered no justification for continuing their no-recruitment policy other than the fact that the Company has never recruited. Cumulatively, these facts create an inference of discriminatory intent sufficient to shift the burden of proof on the existence *vel non* of such intent to the Fire Company.

This conclusion is based in large part on the reasoning of the Supreme Court in *Keyes, supra,* a case involving alleged racial segregation in public education. The *Keyes* Court stated:

> We made it clear, however, that a connection between past segregative acts and present segregation may be present even when not apparent and that close exami-

---

**35.** In subsequent opinions the Court has stressed both subjective and objective evidence in reaching its conclusions; thus, the proper focus of the inquiry into discriminatory purpose remains unsettled. *Compare Arlington Heights, supra, with Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). *See generally* Comment, *Proof of Racially Dis-* *criminatory Purpose Under The Equal Protection Clause: Washington v. Davis, Arlington Heights, Mt. Healthy, and Williamsburgh,* 12 Harv.C.R.—C.L.L.Rev. 725 (1977); Schwemm, *From* Washington *To* Arlington Heights *And Beyond: Discriminatory Purpose In Equal Protection Litigation,* 1977 U.Ill.L.Forum 961.

nation is required before concluding that the connection does not exist. Intentional school segregation in the past may have been a factor in creating a natural environment for growth of further segregation. *Thus, if respondent School Board cannot disprove segregative intent, it can rebut the prima facie case only by showing that its past segregative acts did not create or contribute to the current segregated condition of the core city schools.* 413 U.S. at 211, 93 S.Ct. at 2699. (emphasis supplied). The Fire Company challenges the conclusions of Dr. Siskin on the ground that they are based on the unwarranted assumption that blacks and whites have an equal desire to join a volunteer fire company. The Company contends this assumption is unwarranted because Walker presented no evidence to support it. It is equally true, however, that the defendants presented no evidence to prove that the proposition is not true. Given the absence of any persuasive evidence on the issue, the critical question is who should bear the burden of proof. As the Supreme Court observed in *Keyes, supra,* 413 U.S. at 209, 93 S.Ct. at 2698: "there are no hard-and-fast standards governing the allocation of the burden of proof in every situation. The issue, rather, 'is merely a question of policy and fairness based on experience in the different situations.' 9 J. Wigmore, Evidence § 2486, at 275 (3d ed. 1940)." As this Court stated in analyzing Walker's disparate treatment claim, the special characteristics of a volunteer fire company make it difficult to rule out the possibility that blacks would not be as interested in participating in such an activity as whites. On the other hand, the Court considers it at least equally plausible in the circumstances of this case that blacks may have been chilled from applying either by the all white makeup of the Fire Company or by its failure to recruit actively in the black community or both.[36] Thus, as a matter of fairness, it seems appropriate to place the burden of proof on the Fire Company, because it followed a clearly discriminatory policy until 1960 and took no affirmative steps thereafter to ameliorate the effects of its past discrimination. As a matter of policy, the Court is reluctant to permit a governmental agency like the Robbins Hose Fire Company to assume so readily that the failure of blacks to apply for membership is due to a lack of interest on their part. Especially when, as here, the agency could have tested that assumption without incurring any significant expense or inconvenience. For these reasons, the Court holds that the Fire Company should bear the burden of disproving Dr. Siskin's assumption.

■ Since the Company presented no persuasive evidence to rebut Walker's prima facie case,[37] the Court concludes that its policy of not recruiting violates 42 U.S.C. § 1981 and § 1983 and that injunctive relief is in order. The scope of that relief will be discussed in a later section.

*Tobacco Workers' Int'l Union,* 577 F.2d 1135, 1142–44 (C.A.4, 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 871, 59 L.Ed.2d 56 (1979).

**37.** The Court notes that in its 1977 fund drive letter the Company included the following paragraph:

> Membership in the Robbins Hose Co. # 1 is open to anyone in the community who resides in the Dover Fire District without regard to race, religion, creed or national origin. If you would be interested, please stop by the fire house and pick up an application that is to be returned with $10.00. A medical examination will also be required.

While the Company's action represents a step in the right direction, it is not sufficient in itself to obviate the need for injunctive relief.

**36.** In cases where employers have alleged that a disparity in the proportion of blacks hired versus the proportion of blacks in the general population stems from blacks not applying due to lack of interest, several courts have required the employer to bear the burden of showing that blacks were not "chilled" from applying by the employer's reputation for discrimination. *See Jones v. Lee Way Motor Freight, Inc.,* 431 F.2d 245, 247–48 (C.A.10, 1970), *cert. denied,* 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971); *Ostapowicz v. Johnson Bronze Co.,* 369 F.Supp. 522, 537–39 (W.D.Pa.1973) (sex discrimination), *aff'd in pertinent part,* 541 F.2d 394 (C.A.3, 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 1187, 51 L.Ed.2d 589 (1977); *United States v. Central Motor Lines, Inc.,* 338 F.Supp. 532, 558–59 (W.D.N.C.1971); *Lea v. Cone Mills Corp.,* 301 F.Supp. 97 (M.D.N.C.1969), *modified,* 438 F.2d 86 (1971). *But see Lewis v.*

## B. *The Other Challenged Procedures*

Walker's contentions that the Investigating Committee procedures, the subjective membership criteria, the practice of voting on applicants and the use of arrest records, separately and in combination, have a discriminatory effect on blacks are not so persuasive. While each of the challenged practices arguably leaves room for the operation of racial bias to the prejudice of blacks, the plaintiff must prove more than that to make out a case of discrimination under either § 1981 or § 1983. Walker must persuade the Court that, in operation, the practices in question actually had a disparate impact upon applicants of his race. *Stallings v. Container Corp. of America*, 75 F.R.D. 511, 516 (D.Del.1977).[38] He simply has failed to meet this burden.

The Company amended its membership procedures on April 1, 1974: (1) to eliminate the requirement that applicants obtain the signatures of three life members; (2) to require the Investigating Committee to make a recommendation concerning each applicant; and (3) to provide for automatic acceptance of that recommendation unless a member objects on a ground other than race, color or creed, in which case a vote may be taken to reject the Committee's recommendation. (DX 8). Because Walker seeks only prospective injunctive relief, the issue is whether the procedures in effect since April 1, 1974, have had a discriminatory effect on blacks. The evidence shows that four blacks have applied under the amended rules and all four have been accepted to probationary membership. There is no evidence that the Investigating Com-

mittee investigated black applicants any differently from white applicants.[39] Similarly, the "respectable citizen" criterion has not been shown to have had an adverse effect on blacks. The Court also finds that the criterion is reasonably related to the needs of the Fire Company. Furthermore, the voting procedure now in effect is less susceptible to abuse than the method used when Walker applied and the Court sees no reason to presume in the absence of any supporting facts that it will be applied discriminatorily. Thus, Walker's claim of discrimination based on the Investigating Committee procedures, the membership criterion and the voting process must be denied as not being supported by the evidence.

Finally, Walker's claim that the consideration of arrest records in evaluating whether an applicant meets the respectable citizen requirement has a disparate impact on blacks must also be rejected. In a previous opinion the Court noted that extensive reliance on an applicant's criminal record has been condemned because the practice frequently tends to have a disparate impact on blacks.[40] Dr. Siskin testified that the proportion of blacks among the total number of persons in Kent County having arrest records is slightly more than three times the proportion of blacks among the general population of the State. (Siskin, B–145; PX 10). However, the record shows that of the five blacks who applied for probationary membership only Walker was rejected. Moreover, in Part II of this opinion the Court found that the members of the Company did not rely extensively on Walker's criminal record and that other factors in

---

**38.** The plaintiffs in *Stallings* based their claims on Title VII and 42 U.S.C. § 1981. 75 F.R.D. at 513. The statement referenced in the text was made in the context of a Title VII analysis. Thus, even if the Court accepts the plaintiff's argument that § 1981, like Title VII, does not require a showing of discriminatory intent, he still must prove that the challenged practices had a disparate impact on blacks.

**39.** The Court already has found that the unusually broad scope of the investigation of Walker resulted from the unprecedented public input his application generated and not from any racial motive.

**40.** Memorandum Opinion, dated December 28, 1976 (Docket Item 59, p. 6). In *Green v. Missouri Pacific R. Co.*, 523 F.2d 1290, 1296–99 (C.A.8, 1975), the Court enjoined an employer's use of convictions as an absolute bar to employment. The Eighth Circuit made the same point in an earlier case, but limited its holding as follows:

> We would not consider any rule giving fair consideration to the bearing of the conviction upon applicant's fitness for the fire fighter job to be inappropriate.

*Carter v. Gallagher*, 452 F.2d 315, 326 (C.A.8, 1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).

fact caused them to reject his application. Thus, there is no evidence in this case that the Investigating Committee's practice of obtaining the criminal record, if any, of each applicant actually operated to exclude a disproportionate number of blacks as compared to whites. Since the plaintiff failed to establish any disparate impact, the Court need not decide whether the Company could justify its use of arrest records or whether discriminatory intent must be proved to make out a claim under § 1981.

## IV. REMEDY

The Court has held that the Fire Company violated 42 U.S.C. § 1981 and § 1983 by continually adhering to its traditional practice of not engaging in any active recruiting efforts from 1960, when it ceased its overt discrimination against blacks, until the time of trial, despite the fact that very few blacks ever applied for membership. The plaintiff is entitled to a declaratory judgment to that effect. The defendant Fire Company is entitled to judgment in its favor on the plaintiff's disparate treatment claim and on all aspects of his disparate impact claim except the recruitment aspect. Thus, the only other part of the requested relief to which Walker might be entitled is an injunction ordering the Company to initiate a program to inform the black community that the Company accepts members without regard to race, creed, or national origin and to encourage blacks to volunteer.

Section 1983 by its terms confers upon the courts authority to grant equitable relief in a proper proceeding. *Rizzo v. Goode*, 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). The Court considers injunctive relief appropriate here. The Fire Company will be directed to develop and, following Court approval, to institute a program which will provide effective notice to blacks that membership is open to anyone in the community. The Company shall submit a description of the program to the Court within 30 days of receipt of this Opinion. The program should include publication of a notice similar to the one included in the 1977 fund drive letter (DX 4) in the newspapers of general circulation in the Dover area at least once each year for the next few years. In addition, the program should include some mechanism designed to assure that blacks have easy access to the information needed to make an informed decision whether to volunteer to become a member of the Fire Company. For example, the Company could prepare a fact sheet describing in general terms the different types of membership—auxiliary, probationary and life—the duties and responsibilities of probationary members, the requirements for acceptance as a probationary member, the Investigating Committee's review procedure, including its willingness to consider references submitted by persons in the community who know an applicant, and stating that all membership decisions are made without reference to race, creed or national origin. The Company could make copies of the fact sheet available at the fire house to members of the general public upon request. Copies of the fact sheet also could be distributed to churches and other organizations in the community that are known to have a large number of black members. Finally, the Court suggests that the Company make provisions for informing local high school students concerning the auxiliary membership program in order to advise interested students of all races that such a program is available.

Submit order.